## ARNOLD ROSE v. GERDA KOCH AND ANOTHER.

154 N. W. (2d) 409.

October 20, 1967—No. 40,409.

*Harry H. Peterson* and *Jerome M. Daly,* for appellants.

*Vennum, Newhall, Ackman & Goetz, N. L. Newhall, Jr.,* and *John H. Strothman,* for respondent.

PETERSON, JUSTICE.

A jury in Hennepin County District Court awarded plaintiff, Arnold Rose, general and punitive damages in his action for civil libel against defendants Christian Research, Inc., and Gerda Koch. The jury's verdict, however, absolved a third defendant, Adolph Grinde. Defendants Christian Research, Inc., and Gerda Koch appeal from the

judgment entered against them and from the order denying their post-trial motions for judgment notwithstanding the verdict or for a new trial.

The most important issue for decision is whether a person of this plaintiff's position may recover from these defendants for untruthful and defamatory statements without proof that defendants made those statements either with knowledge that they were false or with reckless disregard of whether or not they were false. A contextual issue is whether the trial court's instructions to the jury concerning the burden of such proof imposed upon plaintiff were constitutionally correct. Our decision in the negative is controlled by recent decisions of the United States Supreme Court imposing constitutional limitations upon the state law of libel. Other and somewhat secondary issues will be stated in the course of this opinion.

## THE PARTIES

Arnold Rose is, by the undisputed evidence of both parties, a person of prominence and public importance in this state and, indeed, nationally and even internationally. He was a state representative from a Minneapolis district in the Minnesota Legislature from early January 1963 to December 31, 1964; his record of effective service was attested at trial by former legislative colleagues. He has been a member of the faculty of the University of Minnesota since 1949 and now holds the rank of full Professor of Sociology. He possesses such other impressive credentials as advanced degrees in sociology from the University of Chicago; former Fulbright Professor at the University of Paris, 1951-1952, and at the University of Rome, 1956-1957; and author of more than 175 scholarly works, for one of which he won the First Award for Essays in Social Theory, American Association for the Advancement of Science. His writings are not directed to scholars alone, for he is a coauthor of a monumental book on race relations, entitled "An American Dilemma," [1] and he is the author of a condensation of that book, entitled "The Negro in America." [2] His lectures are not limited to university student audi-

---

[1] "An American Dilemma" was copyrighted in 1944 and 1962 by Harper & Row, Publishers, Inc.; the book in evidence is First McGraw-Hill Paperback Edition, 1964, 2 volumes.

[2] This book was copyrighted in 1944 and 1948 by Harper & Row, Pub-

ences alone, for he has lectured in this state on the subject of public attitudes towards Communism and has lectured in several foreign countries under the auspices of the State Department of the United States. At the invitation of the President of the United States he has served on such high-level conferences and committees as the National Advisory Committee on Housing for Senior Citizens. He absented himself during the trial for a brief period because of a current commitment to attend one such meeting in Washington, D. C.

Defendant Christian Research, Inc., is a corporation,[3] and defendant Gerda Koch is its administrative head. The board of directors of Christian Research includes several Protestant clergymen.[4] "Our main goal as Christians," Miss Koch testified, is to determine "dangerous trends" in the political leanings and connections of various people throughout the United States in the "firm conviction that the target of the Communist conspiracy is Christianity and the Church." The sincerity of defendants in this fundamental motivation is, with commendable candor, acknowledged by plaintiff.

Christian Research operates a bookstore in the home of Miss Koch containing some 500 hard-cover books and about 1,000 pamphlets and tracts.[5] It publishes a circular-type newspaper,[6] entitled "Facts for

---

lishers, Inc.; the copy examined by the court is First Harper Torchbooks Edition, 1964.

[3] During the forepart of the period in issue it was an unincorporated association, but it was thereafter a corporation. The attorney who assisted in the incorporation was originally a defendant in this action but was dismissed by plaintiff at the opening of trial.

[4] Several of these directors were initially joined as defendants. Plaintiff dismissed as to them when they sent him letters disclaiming responsibility for the preparation of the materials in issue and disavowing any knowledge as to plaintiff's views or associations. Miss Koch's own pastor was called by her as a character witness but was not a defendant; he was never himself either a member of Christian Research, Inc., or a subscriber to its publications.

[5] One tract is entitled "Wanted! Earl Warren for Impeachment," the text of which includes such other members of the United States Supreme Court as Justices Brennan, Black, Douglas, and Harlan. It is a bit ironical that

Action," distributed about 5 times a year to a regular mailing list of approximately 400 subscribers and to visitors of the Minnesota State Fair.

Miss Koch is the editor of "Facts for Action" and "accepts the sole responsibility for [its] contents." The vice-chairman of Christian Research testified that Miss Koch would check with him from time to time but she was responsible for gathering and sending out material which she thought was reliable.[7] Defendants relied upon numerous sources in publishing "Facts for Action"—its own library of books and pamphlets, reports of congressional and state legislative committees, and exchanges of information with other like organizations. It would not appear from this record that Miss Koch has had any prior professional training or experience in sociology, political science, journalism, law, or research disciplines. Her vocational experience has been as an elementary school teacher, most recently as a substitute teacher in the Minneapolis, St. Paul, and Bloomington school districts.

## THE LIBEL

The defamatory statements about Dr. Rose are based primarily upon his collaboration in the writing of "An American Dilemma," so a prefatory word about that book is necessary. The Carnegie Corporation decided, shortly prior to 1940, to make a large-scale study of the Negro problem in the United States. In order to have a description of the problem that would be both comprehensive and objective, Carnegie searched for a scholar of international reputation who had not

---

these men are authors of opinions that influence us to reverse the judgment against these defendants.

[6] Its status as a "newspaper" is determined by Minn. St. 331.01, and § 548.06 provides that punitive damages for a libel by a newspaper may not be had in the absence of an unfulfilled demand for a published retraction. Soderberg v. Halver, 276 Minn. 315, 150 N. W. (2d) 27. This point was not made by any of the litigants and is not itself a basis for the present decision.

[7] No issue exists, accordingly, as to the circumstances in which an employer or corporation may be answerable for the libel of an employee or agent. See, Friedell v. Blakely Printing Co. 163 Minn. 226, 232, 203 N. W. 974, 976.

lived in the United States and who came from a country having no significant number of Negroes in its population. Dr. Gunnar Myrdal, an internationally renowned social economist from Sweden, met these criteria and was selected to direct the project. Myrdal brought with him a Swedish sociologist, Richard Sterner, to assist him in the project. Many other people were invited to participate in the project—some of them were scholars and experts who offered suggestions in the general planning of the research or in planning specific research projects; others were part of the working staff who devoted all of their time to the project and prepared research memoranda on special subjects; and yet others were assistants to such staff members and to "outside collaborators." Dr. Rose, then a recent university graduate, was at that time one of such assistants. These people were acknowledged by name in Myrdal's preface to the book.

The final stage of the project was the writing of the book itself, which was done by Myrdal with the assistance of Sterner and Rose. Dr. Rose prepared drafts for chapters on problems connected with race and population, the present political scene, patterns of discrimination, and the church and education, in addition to editing other portions of the work. Myrdal, in his author's preface to the first edition of the book, wrote most generously of his "collaboration" with Rose and Sterner.[8]

"An American Dilemma" is undoubtedly both a monumental and controversial book. Its theme is the struggle between the democratic ideals

---

[8] "An American Dilemma," p. lvii. In his preface to the Twentieth Anniversary Edition of the book Myrdal spoke even more generously (p. xxiv): "* * * I am particularly gratified that my friend and former collaborator, Arnold Rose, has contributed to the present volume a lucid though compressed review of changes in the status of the Negro in American society in the past twenty years. * * * When he worked as one of my two assistants in preparing the book, he was a young graduate, though of unusually great brilliance and youthful learnedness. In the original preface I have accounted for his important contribution to the study. Since then he has maintained his interest in the field of race relations and is now a distinguished professor at a distinguished university. In an old and cherished tradition, he has also taken his part in popular education and practical action; he has thus, as a citizen, helped to shape the events he is describing."

of equality in the "American Creed" and the lack of equality in the treatment of the American Negro—"the moral dilemma of the White American." Spokesmen of the Communist Party, including one Doxey A. Wilkerson, who had been one of the "An American Dilemma" staff members, condemned it; but several American commentators gave it high praise. The United States Supreme Court cited it in its 1954 school desegregation decision as an authority for holding that segregated schools had a detrimental effect upon Negro children.[9] Senator James O. Eastland (D-Miss.) made a speech in the United States Senate one year later attacking the book and, more particularly, its authors. Eastland labeled Myrdal "a socialist who had served the Communist cause" and charged that 16 of the social experts named in the author's preface had "Communist connections," based upon information "taken right out of lists of members of Communist and subversive organizations dedicated to the overthrow of our Constitution and the United States Government."

Defendants published "Facts for Action," Vol. I, No. 22, in November-December 1962, at times when Dr. Rose was either a candidate for election or a recently elected state representative in the Minnesota Legislature. Two pages of the 10-page issue related to Rose, under the caption "Background of Elected Assemblyman Arnold Rose—University of Minnesota Professor," and read in part:

"It is highly important for every voter to know for whom he is voting, especially since the Communists are working to conquer enemy countries *through legislation*. In the book—AND NOT A SHOT WAS FIRED, the author, Jan Kozal, a Communist, puts forth the plan of how to conquer any country through the legislative process!

"We feel responsible to release the following information on Dr. Arnold Rose, Professor at the University of Minnesota and candidate for the State Legislator:

"1. Arnold Rose assisted the socialist Gunnar Myrdal with the book THE AMERICAN DILEMMA. James O. Eastland, Democratic Senator

---

[9] Brown v. Board of Education of Topeka, 347 U. S. 483, 494, 74 S. Ct. 686, 692, 98 L. ed. 873, 881, 38 A. L. R. (2d) 1180, 1187.

from Mississippi, in his MODERN SCIENTIFIC AUTHORITIES IN THE SEG-
REGATION CASE (May 26, 1955) says of Rose's and Myrdal's AMERICAN
DILEMMA:

"The *American Dilemma* was written in largest part by American
Communist front members, such as E. Franklin Frazier, who contributed
to 28 portions of the book, and W. E. B. DuBois, (Now publicly an-
nounced as a Communist). See FACTS FOR ACTION NO. 25, p. 2) who
contributed to 82 portions of the book. Altogether, the Com-
munist front members identified with Myrdal's AMERICAN DILEMMA
contributed 272 different articles and portions of the book officially
adopted by the Communist Party and by the Supreme Court as its author-
ity for its racial integration decision May 17, 1954. (Ed. See the Mis-
sissippi story, p. 2ff)

"Sen. Eastland mentions 17 other Communist fronters and left-wing-
ers as co-authors of the book. He did not mention Dr. Rose, but Dr.
Rose may be one of those who keep their names out of Communist
fronts but be very useful to them at the same time." [10]

Miss Koch contemporaneously sent a copy of this material to Dr. Rose,
together with a religious tract and Christmas greeting, for the reason,
she testified, that "I felt it was honest to send [it directly to] anybody that
I mentioned in the paper * * *."

"Facts for Action," Vol. I, No. 24, appeared in the spring of 1963,
at which time Dr. Rose was a state legislator. The title page of "Facts
for Action" stated:

"Arnold Rose, Minnesota University Professor and State Legislator,
Collaborates with Communists and Communist Fronters."

The circular contained a reprint of the title page of "An American Di-
lemma," showing the name of its author, Myrdal, under which were the
words, "with the assistance of Richard Sterner and Arnold Rose"; and

---

[10] Most of this material was a verbatim repetition of a "Special Release"
issued a short time before in the election campaign. Dr. Rose testified, and
Miss Koch confirmed, that such material had been circulated by the in-
cumbent and his campaign manager. It does not appear that any action
for libel was considered at that time.

placed in juxtaposition was a partial reprint of what purported to be a hearing report of the Internal Security Subcommittee of the United States Senate Judiciary Committee. The reprint was prominently over-printed with the words, "(The 'Suppressed' Report)." Apparent to a reader of this document is the acknowledged excision of parts of the original document and the insertion of other matter. Not so readily apparent, however, is the fact that some of the inserted matter is a document submitted to the subcommittee by a Colonel Tom Hutton of "SPX Research Associates" entitled "The Supreme Court as an Instrument of Global Conquest," which was actually only an appendix and not part of the subcommittee report itself. In this SPX report was language calling Myrdal a "notorious Swedish Communist" and a man who had been "expelled from office as Swedish Trade Minister for double-dealing with Moscow." Those references were connected to Myrdal and Myrdal was connected to Rose by heavy black arrow-lines. Defendants hand-printed at the bottom of the title page the additional words, "Do Minnesotans want a teacher at its University and a lawmaker at its capitol who collaborate with a 'Communist' and with Communist fronters??" The circular concluded with these words: "Do you want a man who worked with Communists, pros and with a man of whom the Honorable James B. Utt says 'he must be a security risk for our country in any position he may hold.'?"

The third defendant, Adolph Grinde, is involved only in the last episode of defamation. Certain University of Minnesota faculty members had sometime earlier formed a committee to give public lectures on Communism. Rose, who believed "that we had to do something about informing our citizens about Communism," was on the panel of speakers. He selected as his topic, "American public attitudes toward Communism," a subject on which, as he testified, he could speak as an expert sociologist. The Anoka County Library Board invited Rose, a professor of political science, and a professor of journalism to conduct a three-part series in 1963-1964, and public announcement of it was made in the fall of 1963. Defendant Grinde, an individual associated with Christian Research and a subscriber to "Facts for Action," wrote a letter to the Anoka County Board of Commissioners protesting all three invita-

tions and stating in part: "Arnold Rose is co-author with Gunnar Myrdal (a notorious Swedish communist) of the book 'American Dilemma.' " Grinde also enclosed a copy of "Facts for Action," Vol. I, No. 22.

The incident received considerable publicity in the public media. The trial judge by his own interrogation established that defendant Grinde made no distribution of "Facts for Action" after Rose ceased to be a member of the legislature, but such distributions by defendants Koch and Christian Research did continue after that time. The jury returned a defendant's verdict as to Grinde, but not as to Christian Research and Koch.

### DEFAMATION AND FALSITY

■ Defendants contend, as an absolute defense, that these publications concerning plaintiff were not defamatory and were, in any event, the truth. The jury's verdict, under proper instructions from the trial judge, clearly settled that issue. The jury gave Dr. Rose total vindication of his reputation.[11]

Implicit in the jury's verdict is a finding that the words used concerning plaintiff were defamatory, conveying the meaning to the ordinary reader [12]

---

[11] Asked by his counsel as to whether he had experienced any change in attitude toward him as result of these libels, Rose answered: "Well, I can't say so among any of my associates at the University," but that otherwise "I have felt a little bit of suspicion that I might be a subversive character." Following daily newspaper accounts of defendant Grinde's letter to the Anoka County Library Board, Dr. Rose and his family were subjected to nasty telephone calls and other crude harassment. With great candor, however, Rose himself stated in court: "I would like to emphasize that I have no evidence that this was done by Miss Koch or any of her direct associates."

[12] The question always is how would ordinary men naturally understand the language. Jones v. Monico, 276 Minn. 371, 150 N. W. (2d) 213. See, also, Afro-American Pub. Co. v. Jaffe, 125 App. D. C. 70, 366 F. (2d) 649. The trial court instructed the jury as follows: "Your first duty will be to construe ['Facts for Action'] * * * [and] you should look at them as an ordinary reader would and construe their message as a whole by looking at it as a whole as to whether or not it applies to plaintiff. If you find from such construction of ['Facts for Action'] that those exhibits did call Mr. Rose a collaborator or a sympathizer with Communists, then I instruct you that those exhibits are what we call libelous per se * * *."

that plaintiff was, and now is, a collaborator or sympathizer with Communists. The word "collaborate," used by Myrdal in his preface to "An American Dilemma," has a factual, nondefamatory meaning in the denotive sense "to work jointly [especially] with one or a limited number of others in a project involving composition or research to be jointly accredited"; but it has the connotive meaning "to cooperate with or assist [usually] willingly an enemy of one's country."[13] The evidence is so overwhelming of the connotive and defamatory reference as scarcely to admit of doubt. Any doubt was removed by the opening statement of defendants' trial counsel to the jury:

"* * * [Rose] is one of the most resourceful Communists in the whole United States * * *.

* * * * *

"* * * [He] actually collaborated with Communists in the publishing of this book and has been collaborating with them and has entered into a course of conduct over a long period of time of collaboration, although he does not come out openly; * * *."

The real concern shared by millions of Americans about Communist subversion and security risk attests to the serious defamation which attends characterization of any citizen as a willing collaborator with Communists in the pro-Communist sense.[14] To the extent that a Communist is not one dedicated to the openminded search for truth, a charge of being a Communist impugns a basic qualification of a university scholar.

---

[13] Webster's Third New International Dictionary (1961) p. 443.

[14] Grant v. Reader's Digest Assn. (2 Cir.) 151 F. (2d) 733, certiorari denied, 326 U. S. 797, 66 S. Ct. 492, 90 L. ed. 485; Utah State Farm Bureau Fed. v. National Farmers Union Serv. Corp. (10 Cir.) 198 F. (2d) 20, 33 A. L. R. (2d) 1186; Pauling v. News Syndicate Co. (2 Cir.) 335 F. (2d) 659; Spanel v. Pegler (7 Cir.) 160 F. (2d) 619; MacLeod v. Tribune Pub. Co. 52 Cal. (2d) 536, 343 P. (2d) 36; but cf. Clark v. Allen, 415 Pa. 484, 204 A. (2d) 42. In Friedell v. Blakely Printing Co. 163 Minn. 226, 228, 203 N. W. 974, this court, without discussion, held libelous an election-campaign charge in 1925 that a candidate's claim of " 'Americanism' was of such a doubtful character that during the war it was necessary for government agents to watch him" and that he had made "utterances of sympathy for the enemies of the United States."

Implicit in the jury's verdict is the further finding that such defamatory statements were not the truth. The only issue raised by defendants' motion for a new trial is whether the evidence of plaintiff would support that finding. It does. As he had earlier done in the legislature,[15] Dr. Rose explicitly denied that he either was or ever had been a Communist and detailed his personal history of fighting Communism. An impressive array of witnesses testified to his loyalty and integrity.[16] A respected Independent legislator avowed: "He certainly is no more a Communist than I am." A leading Conservative legislator, a member of the House Rules Committee, testified that he had "high respect for [Rose]" and had not "the slightest [reason] to think of him as a Communist sym-

---

[15] In March 1963, the chief clerk of the Minnesota House of Representatives received an envelope containing a communication from a stranger to this action which can best be described as a most venomous diatribe against Jews and Negroes, in which Rose, linked by that stranger to the members of the United States Supreme Court, was called "one of the *most dangerous* men in America." Dr. Rose is a Jew. Counsel for plaintiff conceded on oral argument, however, that defendants were not responsible for that communication.

Thereafter, on March 20, 1963, Rose made a speech on the House floor denying all such charges. He added: "I do not pretend to be a Conservative, but I have respect for a true Conservative — one who wants to conserve and maintain what he considers good and valuable about the existing society. I am, rather, a Liberal, who believes that social forces are constantly modifying the conditions of our existence, and that government must regularly make adjustments to these social changes so that the basic values can be conserved." In the course of the speech, he warned "against these subversives" who, "dedicated and fanatic," are themselves "dangerous revolutionaries" who "parade falsely under the name of 'Conservatives.'" His speech was reported extensively in the public media of press and television.

[16] Including the Minnesota Lieutenant Governor, a Minnesota Congressman, members of the Minnesota Legislature, an outstanding University of Minnesota history professor who had served in a very high World War II position in the American Intelligence Service, and the United States Army Reserve Executive Officer of the Strategic Intelligence Detachment at Fort Snelling. Rose is an honorably discharged veteran of World War II, with the Bronze Star decoration. He had necessarily been cleared by FBI investigation in connection with his lecture trips to foreign countries under the auspices of the State Department.

pathizer." [17] A prominent Liberal legislator testified, from even closer association with Dr. Rose in both the DFL political party and the Liberal legislative caucas, that he had never found "anything in his statements or actions that would indicate any sympathy for the Communist cause."

Because the libel was based so much upon the authorship of "An American Dilemma," Rose testified at length concerning his associates in that project, the relevant essence of which was: He collaborated with Myrdal but Myrdal was not a Communist; whether or not any of the others named by Senator Eastland were Communists or Communist fronters, he neither knew them on any personal basis nor in fact worked with them, his higher-level role being to edit monographic studies submitted to the authors and, in some cases, to reject the material.

■ An evidentiary issue is presented, in that context, by defendants' attempt to prove that Myrdal and persons identified by Myrdal as participants in the "An American Dilemma" project were, as either Senator Eastland or others had asserted, Communists or Communist fronters, this being one premise for rebutting plaintiff's evidence that the charges against him were untrue. Books written about Communist philosophy and programs, from which defendants attempted to prove that Myrdal and Rose had expressed parallel thinking,[18] were

---

[17] Another Conservative legislator, called by defendants, testified: "Now, I'm not saying that Mr. Rose is a Communist * * *. His philosophies in these areas of vital importance to the future of the country as a free nation [in welfare legislation and, more especially, in regard to a World Court] closely parallel many times the programs that will bring us to, in my opinion, eventually a Communist state. Now, this does not make him a Communist."

[18] Defendants pointed particularly to Myrdal's first chapter commentary that American conservatism had been "perverted into a nearly fetishistic cult of the Constitution"; that the "Constitution is in many respects impractical and ill-suited for modern conditions"; that "modern historical studies of how the Constitution came to be as it is reveal that the Constitutional Convention was nearly a plot against the common people"; and that "the Fourteenth Amendment inserted after the Civil War to protect the civil rights of the poor freedmen has, for instance, been used more to protect business corporations against public control." However, Myrdal in

generally excluded by the trial judge on grounds that they were both hearsay and opinion evidence lacking proper foundation.[19] Defendants more particularly argue that it was error to exclude so-called "privileged government documents" containing reported statements of witnesses before legislative committees of Congress or various state legislatures, which were offered by defendants to prove that persons named by Myrdal as participants in "An American Dilemma" were in fact Communists or Communist fronters. The trial court rightly ruled that such documents, being hearsay, were not admissible for the general purpose of proving the truth of such extrajudicial statements. The fact that such statements were printed in government reports and were privileged when made would make them neither less hearsay nor of greater probative value.[20] The trial court did, however, admit numerous

---

other places spoke well of American institutions and, in the foregoing context, commented that the ideological forces of the Christian religion and English law "explain why America through all its adventures has so doggedly stuck to its high ideals [and] why it has been so conservative in keeping to liberalism as a national creed even if not as its actual way of life."

[19] William C. Sullivan, Assistant Director, FBI, in a speech at Highland Park Methodist Church, Dallas, Texas, as reported in the Minneapolis Star, November 13, 1961, quotes J. Edgar Hoover as follows: "* * * [T]he 'party line' will frequently coincide with the views of many noncommunists on specific issues.

"We must not, therefore, indiscriminately label as Communists those whose opinions on a particular question may, on occasion, parallel the official party position. We must also guard against the tendency to characterize as Communists those who merely disagree with us or who advocate unorthodox or unpopular beliefs.

"When anyone is erroneously branded a Communist, it not only constitutes an injustice to the individual, but also helps communism by diffusing the strength of anti-communist forces."

[20] The court seemed to indicate that a *finding* of a legislative committee would be admissible for such general evidentiary purposes, subject to the ultimate determination of the jury as to its credence and weight. Stasiukevich v. Nicolls (1 Cir.) 168 F. (2d) 474, and Pauling v. News Syndicate Co. (2 Cir.) 335 F. (2d) 659, would support that view. Defendants' post-trial motion, however, did not specify the particular books and government documents which it argues were erroneously excluded.

such books and government documents for the limited purpose of showing defendants' "state of mind" and the sources of the information upon which they had relied.[21] The trial court, in the admission and exclusion of evidence, is vested with discretion to determine whether evidence is admissible and whether, even if it has some probative value, its introduction may confuse or mislead the jury. We find no manifest injustice or abuse of discretion in the evidentiary rulings of the trial judge.

Defendants urge, further, that they were denied a fair and impartial trial by what they considered improper conduct of the trial judge during the trial. It is possible that in the course of a trial lasting 3 weeks any court may at times evince feelings of impatience. Even on this cold record, however, it is absolutely apparent that counsel for defendants was far more the offender than the offended. The attitude of the able trial judge is marked more by forbearance than by impatience. In at least one instance the court attempted to counsel Miss Koch against permitting her counsel to put words in her mouth which could only have a highly prejudicial impact upon the jury.[22] The court carefully admonished the jury that there was nothing personal in any abrupt colloquy with counsel, that he did not want them to think that he leaned either way in the lawsuit, and that it was entirely up to them to decide upon the evidence, subject only to his instructions as to the law.

### DEFENSE OF CONDITIONAL PRIVILEGE— JURY INSTRUCTIONS AS TO MALICE

■ The crucial issue is presented by defendants' constitutional de-

---

[21] Such evidence is important on the issue of whether or not defamatory statements were made with malice, which issue is considered later herein.

[22] The trial court's memorandum accompanying its order denying defendants' post-trial motion said: "It is the feeling of the Court that, except for the conduct of defense counsel, the trial was conducted with dignity and restraint on the theory that the issues should be presented to the jury in a proper manner of reason and fairness.

"The jury apparently reacted against the many-headed monster of racial, religious and economic prejudice espoused by the defense in the form of propaganda snowballs and slanted curves that painted a picture of grotesque distortion, prejudice and self-interest."

fense of conditional privilege: That the statements published concerning plaintiff were at all times privileged and therefore, even though defamatory and untrue, were actionable only if published with actual malice in the specific sense that those statements were knowingly false or were made in reckless disregard of whether or not they were false. Our decision is controlled by recent decisions of the United States Supreme Court hereinafter discussed; and upon that authority we must hold that the trial court's instructions to the jury were constitutionally deficient in two fundamental respects:

First, the court erroneously instructed that, although the conditional privilege existed during those times that plaintiff was either a candidate for election or an elected member of the legislature,[23] the privilege did not exist after plaintiff's term of legislative public office had expired.[24] The prejudicial effect of this instruction was to permit the jury to presume malice responsive to the court's further instruction that malice is implied as an element of libel per se when not privileged.[25] We hold, to the contrary, that the conditional privilege ex-

---

[23] This much has been well-settled law in Minnesota even before decision of the United States Supreme Court. Clancy v. Daily News Corp. 202 Minn. 1, 277 N. W. 264; Friedell v. Blakely Printing Co. 163 Minn. 226, 203 N. W. 974; Hammersten v. Reiling, 262 Minn. 200, 115 N. W. (2d) 259, certiorari denied, 371 U. S. 862, 83 S. Ct. 120, 9 L. ed. (2d) 100.

[24] It must be noted, in fairness to the trial court, that the controlling principles of constitutional law had not been announced until after completion of the trial; but, as hereinafter detailed, these principles are fundamental and retroactive in effect. For like reason the issue was properly raised by motion for a new trial even though no exception on that ground was taken to the instructions before the jury retired for its deliberations. Rule 51, Rules of Civil Procedure.

[25] The heart of the court's instructions, repeatedly emphasized, was as follows: "* * * If you find * * * that those exhibits ['Facts for Action'] did call Mr. Rose a collaborator or a sympathizer with Communists, then I instruct you that those exhibits are what we call libelous per se, meaning libelous in and of themselves, * * *. By libelous per se we mean that there are two legal effects, as follows: Number one, damage to the plaintiff's character and reputation in the community is presumed and it is, therefore, not necessary for plaintiff to prove damage, as damage is implied through

isted without limitation of time, on the grounds that for constitutional purposes plaintiff was at all times in issue either a public official or a public figure.

Second, although the court clearly instructed that actual malice is established by proof that it was made with knowledge that it was false or with reckless disregard of whether it was false or not, it incorrectly

---

the nature of the libel itself. Number two, malice is implied and no proof of actual malice is required when words are libelous per se except insofar as the libel applies to the plaintiff as a public official in his official conduct. Now during the period while Arnold Rose was running for office and during the period when he was a member of the State Legislature, which would cover from 1962 to December 31st, 1964, I am instructing you as a matter of law that during that period of time Arnold Rose was a public official within the legal meaning of the term and during that period of time, * * * he must show that the libel was published with actual malice. * * * However, I instruct you as a matter of law that after December 31st, 1964, Mr. Rose was not a public official. His term expired on December 31st, 1964, and from there on out, as a professor at the University, I instruct you as a matter of law he was a private citizen and not a public official and if you find that he was libeled after December 31st, 1964, then, of course, no actual malice is necessary for him to recover in this case.

* * * * *

"* * * The republication of libelous matters constitutes a new and separate libel. * * * [A]t this point in the trial I want to point out to you because it is true as a matter of law and it will be reflected in the verdicts, there is a little different position here between Adolph Grinde and Gerda Koch on this question of redistribution of a libel and I deliberately asked Mr. Grinde that question because I knew what law I was going to give you and what law I felt I had to give you and I asked him when he made his last distribution of Exhibits A and B and he answered that he thought in November of '63, but he was quite sure by his best recollection that he never distributed after December 31st, '64. To me, knowing what law I was going to give you, that was important because Miss Koch has testified under oath that she has kept right on distributing them right up to the present date, * * * that's important on the law I just gave you, because I told you that it puts him in a little different position on some of this law because I told you that from '62 to '64 Arnold Rose was a public official, so during all of the time that Grinde distributed any of this literature, he was distributing it about a public official, whereas I have instructed you as a matter

instructed, in addition, that the jury could consider evidence of personal ill will, the exaggerated language of the libelous document, the extent of its publication, or any other factors that the jury might regard as equally relevant.[26] The latter instruction is neither, on the one hand, a substitute for the constitutional standard of calculated falsehood or reckless disregard of truth nor, on the other hand, an appropriate instruction as to the meaning of that constitutional standard.[27]

---

of law that after December 31st, '64, he was no longer a public official and Miss Koch, but not Mr. Grinde, continued to distribute the literature.

\* \* \* \* \*

"\* \* \* If you find that the charges against the plaintiff \* \* \* were not true and that they were not privileged as being directed without actual malice against the plaintiff while he was a public official, or if you find that they were published after he was no longer a public official, as I indicated in the Koch case, then plaintiff should recover from the defendants as general damages such sum as you feel will reasonably and fairly compensate him for the injury to his reputation and standing in the community and in his profession, without specific actual proof or dollar amounts of such damages."

[26] The court's instruction was: "\* \* \* A statement is made with actual malice if it is made with knowledge that it is false or with reckless disregard of whether it is false or not. Now, in determining actual malice you have a right to consider evidence of any personal bad feelings on the part of the parties; \* \* \* whether or not the language or the material itself was exaggerated; \* \* \* the nature and extent of the publication; and \* \* \* the repetition of the material after the denial by the plaintiff; and any other evidence or factors that you think have a bearing as to whether or not there was actual malice.

\* \* \* \* \*

"\* \* \* If you find that \* \* \* the plaintiff \* \* \* [is] entitled to recover from the other side, you may award [him] in addition to [his] general damages a sum of money for punitive or exemplary damages, if you find that the parties acted wilfully, maliciously and with a reckless disregard of someone else's rights. The reason that the law in this type of case permits punitive or exemplary damages—and punitive just means punishing and exemplary means to set an example—is to deter false and malicious and provocative attacks upon a persons' reputation."

[27] We consider this second ground to be basically interrelated with the first and decisive ground for decision, even though defendants did not

Because the instructions were thus erroneous, there cannot be implied in the jury verdict a finding that defendants acted with knowledge that their defamatory publications were false or with reckless disregard of whether or not they were. The exoneration of defendant Grinde, whose repetition of the libel was made by letter and distribution of "Facts for Action" at the time plaintiff was unquestionably a public official, argues to us the real possibility that the jury, under instructions that actual malice must be proved and not implied, found no calculated falsehood or reckless disregard of truth. In contrast, the verdict against defendants Koch and Christian Research, rendered under the instruction that malice could be implied with respect to any libel subsequent to plaintiff's term of public office, suggests that the jury found malice by implication and not by actual malice in the constitutional sense. Considering the mass of evidence surrounding the publication of "Facts for Action," however, we cannot exclude the possibility that a jury might find such actual malice, although it might not.[28]

---

squarely raise it. Defendants, as a matter of fact, invited instructions in terms of New York Times Co. v. Sullivan, 376 U. S. 254, 84 S. Ct. 710, 11 L. ed. (2d) 686, 95 A. L. R. (2d) 1412, and Friedell v. Blakely Printing Co. 163 Minn. 226, 203 N. W. 974, which this eclectic instruction is. Neither the court nor counsel had the benefit of the subsequent decisions which have more precisely articulated the meaning of that constitutional standard, even if in negative terms of what it is not. This court should raise the issue sua sponte, in any event, for the assistance of the trial bench.

[28] It is on this issue that "government documents" and other evidence of the statements of Senator Eastland and Congressman Utt and other evidence of somewhat ambiguous nature was admitted into evidence for the limited purpose of showing Miss Koch's "state of mind." The fact that these documents are hearsay would not alone prevent exculpatory reliance except perhaps to the extent that the nature of the hearsay documents might disclose that such statements were palpably baseless. Compare the reliance in the New York Times case upon the certification of an outsider whom it considered a responsible person. 376 U. S. 260, 84 S. Ct. 715, 11 L. ed. (2d) 695, 95 A. L. R. (2d) 1423. The jury could consider, too, the use made by defendants of the "Suppressed Report" which it might find gave a deliberately false impression that it was an actual congressional finding. Miss

THE CONSTITUTIONAL LIMITATIONS UPON LIBEL

Beginning in 1964 with New York Times Co. v. Sullivan, 376 U. S. 254, 84 S. Ct. 710, 11 L. ed. (2d) 686, 95 A. L. R. (2d) 1412, the United States Supreme Court has established a new law of libel, with constitutional dimension. State laws of libel that fail to provide safeguards for freedom of speech and of the press, guaranteed by the First Amendment to the United States Constitution and made applicable to the states by the Fourteenth Amendment, are constitutionally deficient. We are, in the words of Mr. Justice Goldberg, "writing upon a clean slate." [29] An examination of those cases, we think, will make the decisive application of the new law to the instant case fully apparent.

First, public officials and other public figures are subject to vigorous attack, including, under certain circumstances, defamatory and untruthful attack. Mr. Justice Brennan, writing for the majority of the court in New York Times, held that an action by a public official for libel must be considered "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." [30] The First Amendment is, he wrote, an "at-

Koch testified that she had "confidence in [her] sources"; Grinde, in turn, testified that he believed that "Facts for Action" had merit and that he "still believe[d]" it. Because Miss Koch testified that at the time she wrote the first issue of "Facts for Action" she had no other evidence than the contents of "An American Dilemma" and the names of persons named as collaborators in the book, the jury might find that she had not in fact relied on such government documents. The ultimate jury issue, nevertheless, would be whether or not defendants' reliance, although mistaken, was mere negligence rather than reckless, or even calculated, falsehood. Whatever the instructions, as a practical matter, the jury will be influenced by the conduct of the parties themselves during trial.

[29] Concurring opinion, 376 U. S. 299, 84 S. Ct. 736, 11 L. ed. (2d) 719, 95 A. L. R. (2d) 1447.

[30] 376 U. S. 270, 84 S. Ct. 721, 11 L. ed. (2d) 701, 95 A. L. R. (2d) 1430.

tempt to secure 'the widest possible dissemination of information from diverse and antagonistic sources,' " [31] recognizing that " 'public men, are, as it were, public property,' and 'discussion cannot be denied and the right, as well as the duty, of criticism must not be stifled.' " [32] Relevant to the instant case, the court said that constitutional protection "does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are offered' " [33] —that "In the realm of religious faith, and in that of political belief, * * * resorts to exaggeration, to vilification * * *, and even to false statement" [34] are simply degrees of abuses which "must be protected if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive.' " [35] Mr. Justice Black, joined by Mr. Justice Douglas, disagreed only on the ground that the constitutional protection is even more unlimited and grants the citizen an "unconditional right to say what one pleases about public affairs." [36] Mr. Justice Goldberg, joined by Mr. Justice Douglas, disagreed for like reason:

"* * * The right should not depend upon a probing by the jury of the motivation of the citizen or press. * * *

*    *    *    *    *

[31] 376 U. S. 266, 84 S. Ct. 718, 11 L. ed. (2d) 698, 95 A. L. R. (2d) 1428, quoting from Associated Press v. United States, 326 U. S. 1, 20, 65 S. Ct. 1416, 1424, 89 L. ed. 2013, 2030.

[32] 376 U. S. 268, 84 S. Ct. 720, 11 L. ed. (2d) 699, 95 A. L. R. (2d) 1429, quoting from Beauharnais v. Illinois, 343 U. S. 250, 263, note 18, 264, 72 S. Ct. 725, 734, 96 L. ed. 919, 931.

[33] 376 U. S. 271, 84 S. Ct. 721, 11 L. ed. (2d) 701, 95 A. L. R. (2d) 1430, quoting from N. A. A. C. P. v. Button, 371 U. S. 415, 445, 83 S. Ct. 328, 344, 9 L. ed. (2d) 405, 425.

[34] 376 U. S. 271, 84 S. Ct. 721, 11 L. ed. (2d) 701, 95 A. L. R. (2d) 1430, quoting from Cantwell v. Connecticut, 310 U. S. 296, 310, 60 S. Ct. 900, 906, 84 L. ed. 1213, 1221. Dr. Rose himself once observed that "there is a little of the muckraker and preacher in all Americans." "The Negro in America," p. 8.

[35] 376 U. S. 271, 84 S. Ct. 721, 11 L. ed. (2d) 701, 95 A. L. R. (2d) 1431.

[36] 376 U. S. 297, 84 S. Ct. 735, 11 L. ed. (2d) 718, 95 A. L. R. (2d) 1446.

"* * * If individual citizens may be held liable in damages for strong words, which a jury finds false and maliciously motivated, there can be little doubt that public debate and advocacy will be constrained." [37]

The New York Times rule emerging from this constitutional background is:

"The constitutional guarantees * * * [prohibit] a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." [38]

Second, the privilege of defamatory attack is applicable to public figures even though such figures are not public officials. The plaintiff in New York Times was an elected city commissioner of Montgomery, Alabama, with supervision over police, unquestionably a public official; but the court expressly reserved judgment both as to the ultimate scope of the term "public official" and the boundaries of the "official conduct" concept.[39] The New York Times concept of "public official" was broadened in Rosenblatt v. Baer, 383 U. S. 75, 86 S. Ct. 669, 15 L. ed. (2d) 597, to include a former and nonelected public official, a man who had been a supervisor of a county recreation area whose conduct while in that position was criticized by a newspaper in defamatory terms. The court made clear that a person's status as a public official is not to be determined by state law:

"* * * [W]e reject at the outset * * * that it should be answered by reference to state-law standards. States have developed definitions of 'public official' for local administrative purposes, not the purposes of a national constitutional protection. If existing state-law standards reflect the purposes of New York Times, this is at best accidental." [40]

---

[37] 376 U. S. 298, 84 S. Ct. 736, 11 L. ed. (2d) 719, 95 A. L. R. (2d) 1446.

[38] 376 U. S. 279, 84 S. Ct. 726, 11 L. ed. (2d) 706, 95 A. L. R. (2d) 1435.

[39] 376 U. S. 283, note 23, 84 S. Ct. 727, 11 L. ed. (2d) 708, 95 A. L. R. (2d) 1436.

[40] 383 U. S. 84, 86 S. Ct. 675, 15 L. ed. (2d) 604.

Rather, it is for constitutional purposes to be determined by whether the person, in the Rosenblatt case a government employee, has, or appears "to the public to have, substantial responsibility for or control over the conduct of governmental affairs." [41] Rosenblatt additionally stated the role of the trial judge in the determination of privileged status:

"* * * [A]s is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show respondent [plaintiff] to be a 'public official.' " [42]

Time, Inc. v. Hill, 385 U. S. 374, 87 S. Ct. 534, 17 L. ed. (2d) 456, extended the New York Times principle to nongovernmental issues and nongovernmental persons. In Rosenblatt the Supreme Court had said:

"* * * There is, first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues." [43]

Now, in Time, Inc., the Supreme Court holds that the "guarantees for speech and press are not the preserve of political expression or comment upon public affairs." [44] That case was a statutory action for invasion of the right of privacy arising out of a Life magazine article which falsely reported that a new play portrayed an experience suffered by plaintiff and his family at the hands of escaped convicts, whereas the play was in fact a fictionalized and exaggerated dramatization of the events grossly embellishing the hazard and harassment suffered by plaintiff at the hands of the convicts. The court, however, likened the interest protected in privacy cases to those protected in libel cases.

The defamatory publication in the instant case occurred almost 20 years after "An American Dilemma" was first published, but, as the court observed on comparable facts in Time, Inc.:

---

[41] 383 U. S. 85, 86 S. Ct. 676, 15 L. ed. (2d) 605.
[42] 383 U. S. 88, 86 S. Ct. 677, 15 L. ed. (2d) 606.
[43] 383 U. S. 85, 86 S. Ct. 675, 15 L. ed. (2d) 605.
[44] 385 U. S. 388, 87 S. Ct. 542, 17 L. ed. (2d) 467.

"\* \* \* No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression." [45]

Although Time, Inc., involved a nondefamatory invasion of privacy as to an ordinary private citizen catapulted into the news by events over which he had no control, the application of the New York Times rule to defamation of nonofficial public figures was squarely reached in Curtis Pub. Co. v. Butts and Associated Press v. Walker, 388 U. S. 130, 87 S. Ct. 1975, 18 L. ed. (2d) 1094. Wallace Butts was the athletic director of the state-supported University of Georgia and a respected figure in his coaching profession. Even though Butts had an overall responsibility for the school's athletic program, he was actually employed by the Georgia Athletic Association, a private organization and not a state agency. Edwin A. Walker, as the court stated, was a private citizen at the time of the libel, although he had previously pursued a long and honorable career in the United States Army. Seven members of the United States Supreme Court agreed that both Butts and Walker were public figures for First Amendment purposes.[46]

The rationale of the Butts and Walker cases is of instant application to plaintiff Rose:

"\* \* \* [B]oth Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; both, in our opinion, would have been labeled 'public figures' under ordinary tort rules. \* \* \* Butts may have attained that status by position alone and Walker by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy, but both commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able

---

[45] 385 U. S. 388, 87 S. Ct. 542, 17 L. ed. (2d) 467, quoting from Bridges v. California, 314 U. S. 252, 269, 62 S. Ct. 190, 196, 86 L. ed. 192, 206.

[46] Mr. Chief Justice Warren indicated that two members did not deem it necessary to pass on the question. 388 U. S. 162, 87 S. Ct. 1995, 18 L. ed. (2d) 1115.

'to expose through discussion the falsehood and fallacies' of the defamatory statements." [47]

Butts' "position alone" was either as a university athletic director or as a "well-known and respected figure in coaching ranks." Rose is both a university professor and a well-known and respected figure in a field uniquely pertinent to public affairs. To deny application of the New York Times principle to Dr. Rose would indeed be a discredit to his stature. His access to means of public defense, moreover, was disclosed both by his publicly reported defense in the legislature following the release of the first issue of "Facts for Action" and by his "many" statements to the newspapers who called him "from time to time," particularly after defendant Grinde's episode with the Anoka County Library Board.

The Court of Appeals for the Eighth Circuit reached the same result in Pauling v. Globe-Democrat Pub. Co. 362 F. (2d) 188,[48] even prior to the Butts and Walker decisions. Defendant newspaper publisher, reacting to Dr. Pauling's objection to nuclear testing, wrote an editorial entitled "Glorification of Deceit" in somewhat inaccurate and allegedly defamatory terms.[49] The court considered Pauling to be a public figure because he was a scholar and scientist of international prominence who had written and spoken extensively and had undertaken to provide

---

[47] 388 U. S. 154, 87 S. Ct. 1991, 18 L. ed. (2d) 1111.

[48] See, also, Pauling v. National Review, Inc. 49 Misc. (2d) 975, 269 N. Y. S. (2d) 11; Pauling v. News Syndicate Co. Inc. (2 Cir.) 335 F. (2d) 659, certiorari denied, 379 U. S. 968, 85 S. Ct. 662, 13 L. ed. (2d) 561.

[49] Reminiscent of Dr. Rose's expressed motive for commencing the action in the instant case, the Globe-Democrat editorial also said (362 F. [2d] 199): "The petition of 140 members of the Washington University faculty in support of the defiance of Linus Pauling of the United States Senate dangerously compromises the good name and patriotism of that great University."

Dr. Rose said, "[A]t first I didn't think that Miss Koch was very important * * *. But then when ['Facts for Action'] became a foundation for an attack on the University, then I felt that Miss Koch was important, important enough to state what I thought about her publicly and to try to show what she stood for to the public."

leadership among academic and scientific people on that controversial subject. It concluded, in the words of Judge Blackmun (362 F. [2d] 196):

"* * * [A] rational distinction cannot be founded on the assumption that criticism of private citizens who seek to lead in the determination of national policy will be less important to the public interest than will criticism of government officials. A lobbyist, a person dominant in a political party, the head of any pressure group, or any significant leader may possess a capacity for influencing public policy as great or greater than that of a comparatively minor public · official who is clearly subject to New York Times."

Clark v. McBaine, 299 Mo. 77, 252 S. W. 428, decided in 1923, although not squarely in point, applied the concept of qualified privilege to adverse comment upon the fitness of a state-supported university faculty member. The court there said (299 Mo. 93, 252 S. W. 432):

"The School of Law is a department of the University of Missouri which is an institution established by law and governed in accordance with legislative enactments, and supported by taxation. * * * That institution and its various departments therefore become the proper and legitimate subjects of comment through the public press of the State.

*     *     *     *     *

"The appellant having sought to be reinstated as a teacher in the law faculty in the University, a public position of great responsibility and obvious interest to citizens generally of the State, his fitness and qualifications for that position were subjects for public comment, and the comments as such were privileged." [50]

We hold that plaintiff is a public figure for the constitutional purposes of this case. We need not determine whether he is a public figure solely by virtue of his position as a university professor, be-

---

[50] A possibly distinguishing fact in the Clark case, however, is that appellant, who had been dismissed by the university, had himself projected the controversy into public print by claims that his dismissal was unjust and by a countercharge against the fitness of the university president.

cause his university position is but one of many facets in his figure. We of course do not reach the question of whether a person holding high position with the state-supported university is a public official.

Third, the meaning of "actual malice" stated in New York Times, although not fully articulated in subsequent decisions of the United States Supreme Court, has been given definition at least in terms of what it is not. It is, as Mr. Justice Black observed, concurring in New York Times, seemingly "an elusive, abstract concept, hard to prove and hard to disprove." [51] Mr. Justice Stewart, a member of the majority in New York Times, spoke critically of the malice standard in his concurring opinion in Rosenblatt v. Baer, *supra*:

"We use misleading euphemisms when we speak of the New York Times rule as involving 'uninhibited, robust, and wide-open' debate, or 'vehement, caustic, and sometimes unpleasantly sharp' criticism. What the New York Times rule ultimately protects is defamatory falsehood. No matter how gross the untruth, the New York Times rule deprives a defamed public official of any hope for legal redress without proof that the lie was a knowing one, or uttered in reckless disregard of the truth." [52]

Malice, we know, is not to be presumed. It must be proved by plaintiff, and with "convincing clarity." [53] A reviewing court must be able to determine, both from the instructions and the evidence, that the jury found that defendant acted with actual malice. In New York Times, the state judgment was reversed and remanded because the trial court had not instructed the jury to differentiate between general and punitive damages, so that the general verdict made it impossible to determine whether it was wholly an award of one or the other. In Rosenblatt v. Baer, *supra,* on the other hand, the state judgment was re-

[51] 376 U. S. 293, 84 S. Ct. 733, 11 L. ed. (2d) 716, 95 A. L. R. (2d) 1444.

[52] 383 U. S. 92, 86 S. Ct. 679, 15 L. ed. (2d) 609. See, also, dissenting opinion of Mr. Justice Harlan in Time, Inc. v. Hill, 385 U. S. 374, 405 to 411, 87 S. Ct. 534, 551 to 554, 17 L. ed. (2d) 456, 477 to 480.

[53] New York Times Co. v. Sullivan, 376 U. S. 254, 285, 84 S. Ct. 710, 729, 11 L. ed. (2d) 686, 710, 95 A. L. R. (2d) 1412, 1438.

versed and remanded even though the trial court did give separate instructions as to compensatory damages and punitive damages, for the trial court's instructions were erroneous both as to the privilege status of plaintiff and as to the definition of actual malice.

Malice is more than negligence and is probably even more than "highly unreasonable conduct." In Garrison v. Louisiana, 379 U. S. 64, 85 S. Ct. 209, 13 L. ed. (2d) 125, a state criminal libel statute which defined "actual malice" to include a false statement not made "with reasonable belief of its truth" was held constitutionally deficient. A "calculated falsehood," the court held, means "false statements made with the high degree of awareness of their probable falsity"; [54] and the "reckless-disregard-of-truth standard" was held to require substantially more than the absence of reasonable belief of truth. In Time, Inc. v. Hill, supra, an instruction that punitive damages were justified on the basis of a "failure to make a reasonable investigation" was held constitutionally erroneous, being tantamount to "an instruction that proof of negligent misstatement is enough." [55] In Rosenblatt v. Baer, 383 U. S. 75, 84, 86 S. Ct. 669, 675, 15 L. ed. (2d) 597, 604, the court reiterated what it said in Garrison v. Louisiana, 379 U. S. 64, 79, 85 S. Ct. 209, 218, 13 L. ed. (2d) 125, 135:

"* * * The test which we laid down in New York Times is not keyed to ordinary care; defeasance of the privilege is conditioned, not on mere negligence, but on reckless disregard for the truth."

Curtis Pub. Co. v. Butts and Associated Press v. Walker, supra, discussed later in this opinion, introduced the concept that malice could be established by proof of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." [56] This concept, however, was considered applicable only to public figures, constituting a less strict standard than that required in the case of public officials. It would seem, therefore, that the justices advocating that standard, as well as the justices who announced adherence to New York

[54] 379 U. S. 74, 85 S. Ct. 216, 13 L. ed. (2d) 133.
[55] 385 U. S. 396, 87 S. Ct. 546, 17 L. ed. (2d) 471.
[56] 388 U. S. 155, 87 S. Ct. 1991, 18 L. ed. (2d) 1111.

Times for both public figures and public officials, would agree that malice is not less than such "highly unreasonable" conduct.

Malice is not proved merely by the existence of ill will or intent to cause harm. What must be proved is an intent to cause harm *through falsehood*. In Rosenblatt v. Baer, *supra,* an instruction defining malice to include "ill will, evil motive, [or] intention to injure" was held constitutionally insufficient.[57] In Garrison the court said:

"* * * [E]ven where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood. Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." [58]

Whether a failure to make a retraction of a libelous statement is evidence of malice is as yet uncertain. Although the making of a demand for retraction is prerequisite to an award of punitive damages against a newspaper under Minnesota statute,[59] this state law is not determinative. New York Times expressly reserved the question of "[w]hether or not a failure to retract may ever constitute such evidence." [60] Similarly, the repetition of the defamatory statement after a denial of the charge has been communicated to the defamer is not a determinative fact. One of the circumstances in the Butts case, noted only in the concurring opinion of the Chief Justice, was that the Saturday Evening Post editors had made no additional inquiries to determine the truth of its forthcoming article, even after Butts had notified the editors that the account about to be published was untrue.[61] It would otherwise have been our opinion,

---

[57] 383 U. S. 84, 86 S. Ct. 675, 15 L. ed. (2d) 604.

[58] 379 U. S. 73, 85 S. Ct. 215, 13 L. ed. (2d) 132. See, also, Henry v. Collins, 380 U. S. 356, 85 S. Ct. 992, 13 L. ed. (2d) 892.

[59] See footnote 6, *supra.*

[60] 376 U. S. 286, 84 S. Ct. 729, 11 L. ed. (2d) 710, 95 A. L. R. (2d) 1439.

[61] 388 U. S. 169, 87 S. Ct. 1999, 18 L. ed. (2d) 1119.

as it was that of the trial court, that such circumstance would be of real relevance on the issue.

The unsuccessful attempt to prove the truth of the defamatory statement cannot itself, in our opinion, establish actual malice. Defendant is entitled in his own defense to use more than one arrow in his bow.[62] In Hammersten v. Reiling, 262 Minn. 200, 115 N. W. (2d) 259, certiorari denied, 371 U. S. 862, 83 S. Ct. 120, 9 L. ed. (2d) 100, we held, inter alia, that defendant's *failure* to submit evidence to establish the truth of his libelous charges was itself an element to be considered in finding the existence of malice for purposes of punitive damages.

In the Butts and Walker cases four members of the Supreme Court introduced seemingly a different standard of malice, but applicable only to libels of "public figures." The main opinion, subscribed by only four justices, stated, "It is the conduct element * * * on which we must principally focus if we are successfully to resolve the antithesis between civil libel actions and the freedom of speech and press," [63] and concluded (388 U. S. 155, 87 S. Ct. 1991, 18 L. ed. [2d] 1111):

"* * * [A] 'public figure' who is not a public official may * * * recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers. * * *

"Nothing in this opinion [however] is meant to affect the holdings in New York Times and its progeny, including our recent decision in Time, Inc. v. Hill."

Whatever such standard of malice might be, it is notably a less strict standard than that of New York Times, as the opinions of the five other justices make more obvious. The majority decision in Butts was achieved by the concurrence of Chief Justice Warren in the result. But his concurring opinion, joined on that point by Justices Brennan and White,

---

[62] See, Pauling v. News Syndicate Co. Inc. (2 Cir.) 335 F. (2d) 659, certiorari denied, 379 U. S. 968, 85 S. Ct. 662, 13 L. ed. (2d) 561.

[63] 388 U. S. 153, 87 S. Ct. 1990, 18 L. ed. (2d) 1110.

called it a "departure" and asserted their adherence to the New York Times rule for both public officials and public figures.[64] New York Times, with its emphasis on moral culpability, had stated:

"The state rule of law is not saved by its allowance of the defense of truth. A defense for erroneous statements honestly made is no less essential here than was the requirement of proof of guilty knowledge which, in Smith v. California, 361 U. S. 147 [80 S. Ct. 215, 4 L. ed. (2d) 205], we held indispensable to a valid conviction of a bookseller for possessing obscene writings for sale." [65]

Mr. Justice Black, joined by Mr. Justice Douglas, dissenting in the Butts case, asserted their own conviction that First Amendment rights are absolute and that "the Court is getting itself in the same quagmire in the field of libel in which it is now helplessly struggling in the field of obscenity." [66]

The practical effect of such a public-figure standard of malice is illustrated by the different facts and different results in the two cases. In Walker, the Associated Press published a dispatch which, although in

---

[64] A new "rule" applicable only to public figures has probably not been established, although it was apparently a necessary predicate for a majority disposition of the Butts case. The Walker case, however, was nevertheless remanded for further proceedings "not inconsistent with the opinions that have been filed herein by the Chief Justice, Mr. Justice Black and Mr. Justice Brennan." Five of the justices then on the court there made clear they did not agree with that predicate and Mr. Justice Clark, one of the other four, is no longer a member of the court. In Walker, Justices Black and Douglas stated agreement with the Chief Justice's view that public officials and public figures should receive the same treatment under the rule of New York Times; but in Butts they dissented on the ground that the rule of New York Times should be abandoned in favor of no rule at all.

[65] 376 U. S. 278, 84 S. Ct. 725, 11 L. ed. (2d) 705, 95 A. L. R. (2d) 1434; and see the Supreme Court's footnote 19, quotation from Mill, On Liberty (Oxford: Blackwell, 1947), at 15.

[66] 388 U. S. 171, 87 S. Ct. 2000, 18 L. ed. (2d) 1120. Dean Prosser, writing in a different vein, recently observed that "the Supreme Court has practically done away with all rules as to what may be published." Der Gegenverkehr des Wasserniedersinkens in der nördlichen und der südlichen Hemisphäre, 51 Minn. L. Rev. 899, 902.

part untrue, was based on information received from a correspondent present at the scene who "gave every indication of being trustworthy and competent," and nothing on its face gave the "slightest hint of a severe departure from accepted publishing standards." [67] Because it was, as the court termed it, "hot news," immediate dissemination was necessary, so less opportunity was afforded to confirm the accuracy of the story.[68] The judgment for Walker was reversed on the ground that no actual malice was established. In Butts, in contrast, the Saturday Evening Post published a story which was wholly false and which was based on the affidavit of a stranger, one Burnett, who inadvertently overheard a telephone conversation between Butts and the coach of the rival Alabama football team. Because it was a magazine article having no daily deadline, there was ample opportunity to check the accuracy of Burnett's questionable affidavit, the substance of which was that Butts had "fixed" the forthcoming football game by disclosing his team's game plans to this rival; but the Post did not do so. The Post, moreover, published the article for no significant public purpose; rather, its purpose was commercial: To increase circulation by a new editorial policy of exposé and thereby bolster declining advertising revenues. The judgment for Butts was affirmed on the vote of five justices, four of whom voted on the basis of the different standard of malice they would apply to public figures.[69]

---

[67] 388 U. S. 158, 159, 87 S. Ct. 1993, 18 L. ed. (2d) 1113.

[68] General Walker, as the court stated, "had pursued a long and honorable career in the United States Army before resigning to engage in political activity." 388 U. S. 140, 87 S. Ct. 1984, 18 L. ed. (2d) 1102. The alleged libel in the Associated Press dispatch was that Walker had taken command of the violent crowd engaged in a riot on the campus of the University of Mississippi at the time of James Meredith's enrollment, had encouraged the use of violence, and had personally led a charge against Federal marshals sent there to enforce a court decree. The only truth in the dispatch was that Walker had been on the campus at the time and had spoken to a group of students. Walker, who had commanded Federal troops during the school desegregation confrontation at Little Rock, Arkansas, had, on other occasions, spoken out strongly against such physical Federal intervention, but on this occasion he had counseled the students to use restraint and peaceful protest and had not charged the Federal marshals.

[69] Chief Justice Warren concurred in affirmance, but on the ground that

Decision in this case, however, would not turn on the existence of such lesser standard of malice. Attempting to apply two different rules to this case, framing one set of instructions for so much of the libel as occurred prior to December 31, 1964, and another set for the libel occurring thereafter, would tax the ingenuity of the trial court and hopelessly confuse the jury. We hold, therefore, that only the New York Times rule is applicable to a libel of a person who is for part of the time a public official and for another part of the time a public figure without being a public official.[70]

Fourth, the standards of malice announced in these cases, and their application to both public officials and public figures, are retroactively applicable to cases pending before the announcement of such decisions.[71] In Rosenblatt v. Baer, *supra,* the decision of the state court was reversed because the trial court's jury instructions were constitutionally deficient; but, because the trial occurred before New York Times was decided, the matter was remanded rather than to foreclose retrial under proper in-

---

the New York Times standard had actually been met by the trial court's instruction that, to find "wanton and reckless indifference" for purposes of punitive damages, the jury should assess "the reliability, the nature of the sources of the defendant's information, its acceptance or rejection of the sources, and its care in checking upon assertions." 388 U. S. 156, 87 S. Ct. 1992, 18 L. ed. (2d) 1111. The Chief Justice was, however, alone in this view.

[70] Accordingly, we do not decide the degree to which "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" is less than "reckless disregard of the truth." Neither do we consider how a judge or jury would ascertain who are "responsible publishers" or what are their "standards of investigation and reporting." Nor do we decide whether or not defendants, having less investigative and reporting talent or training, would be held to standards "ordinarily adhered to by [such] responsible publishers" as giant publishing houses, news services, or metropolitan daily newspapers.

[71] The New York Times case was decided March 9, 1964; the Butts and Walker cases on June 12, 1967. The instant case was commenced in late 1964; trial commenced November 1, 1965, and was completed November 23, 1965; judgment was entered May 3, 1966; and appeal was taken May 23, 1966.

structions, particularly where the record suggested that the plaintiff might be able to present a jury question of malice as defined in New York Times.[72]

Curtis Pub. Co. v. Butts, *supra,* held that such retroactive application cannot .be avoided on grounds of waiver. The lead counsel for Curtis Publishing had conferred periodically with counsel for New York Times and, indeed, one of the counsel for Curtis was involved as counsel in the actual trial of New York Times, so that counsel for Curtis were fully aware of the progress of the earlier case. It was only after the New York Times decision was announced, however, that Curtis sought to raise the constitutional issue, which it did by motion for a new trial. The Court of Appeals for the Fifth Circuit held that Curtis had waived its right to raise the constitutional issue,[73] but the United States Supreme Court held otherwise:

"* * * As our dispositions of Rosenblatt v. Baer * * * and other cases involving constitutional questions indicate, the mere failure to interpose such a defense prior to the announcement of a decision which might support it cannot prevent a litigant from later invoking such a ground." [74]

We decide, therefore, that the judgment must be reversed but we remand for a new trial consistent with this opinion.

Reversed and remanded.

---

[72] A similar decision had been rendered in New York Times, and the court there noted that it must independently examine the evidence of record for the purpose of determining whether it would *constitutionally* support the judgment. The record submitted by defendants in the instant case did not comply with the rules of this court for consideration of several issues raised by defendants; but we have nevertheless examined the whole of the original transcript and the exhibits in compliance with this constitutional responsibility.

[73] The Court of Appeals also concluded, however, that there was ample evidence from which the jury could find that Curtis had acted with reckless disregard of whether its article was false or not.

[74] 388 U. S. 142, 87 S. Ct. 1985, 18 L. ed. (2d) 1104.