## WILLIAM L. MAHNKE v. NORTHWEST PUBLICATIONS, INC.

160 N. W. (2d) 1.

May 31, 1968—No. 40,745.

*Oppenheimer, Hodgson, Brown, Wolff & Leach* and *David C. Donnelly,* for appellant.

*Erickson, Popham, Haik & Schnobrich, Wayne G. Popham,* and *Rolfe A. Worden,* for respondent.

NELSON, JUSTICE.

In this action for libel, defendant, Northwest Publications, Inc., appeals from an order denying its motion for judgment n. o. v. or a new trial. Plaintiff, William L. Mahnke, was awarded a verdict of $3,000 general damages plus $1,000 punitive damages.

Defendant is the owner and publisher of two daily St. Paul newspapers, the St. Paul Dispatch and the St. Paul Pioneer Press. Plaintiff was and is a detective captain with the Minneapolis Police Department. The libel for which plaintiff recovered was contained in the following article, which appeared in the "Sunset Final" edition of the St. Paul Dispatch January 21, 1960:

"COP REBUKE IN TOT MOLESTING URGED

"A Minneapolis Catholic priest today demanded an official reprimand for one of that city's detective captains because he said the *police official had refused to arrest* a man involved in a serious child-molesting case.

"Involved in the complaint, which he said he would 'carry to the governor if necessary,' are Father Thomas F. Meagher, executive director of the Catholic Welfare association, and William L. Mahnke, one of four Minneapolis police department detective captains.

"Father Meagher said the case was brought to his attention by a parish priest to whom a woman complained that her husband was sexually molesting their 6-year-old daughter. A doctor examined the girl and verified the molesting.

" 'It was the worst case of incest ever to come to my attention,' Father Meagher said.

"Father Meagher who also serves as Catholic chaplain for Hennepin district and Minneapolis municipal courts, sent the mother and child to police. Statements were taken from them by the department's sex squad. *Detective William Quady then sought permission from Captain Mahnke to arrest the father.*

"Rev. Meagher said *Mahnke 'flew into a rage'* when he learned the woman had discussed the case with her parish priest before coming to police and *accused her of 'trying to get even with her husband.'*

" '*Mahnke told her there was no case and refused to send out detectives to make the arrest,'* Father Meagher said today. 'I don't believe police officials should be allowed *to set themselves up as judges and juries* in the face of such evidence.'

"When the woman returned and told Father Meagher what had happened, he complained to another detective captain, Calvin Hawkinson, who had the father arrested. The father later gave a statement admitting that he had sexually molested the child and is being held in the city jail pending filing of charges, Father Meagher said.

"The Catholic official carried his complaint of the woman's treatment to Chief of Police Milton E. Winslow, Mayor Peterson and the city's civil service commission.

" 'I don't care what Mahnke's punishment is,' he said today, 'but he is going to get an official reprimand if I have to carry the matter to the governor.'

"He refused to be calmed by Chief Winslow's comment that the affair was only a 'misunderstanding or error of judgment' and *refused to participate in a meeting the chief was seeking to arrange between Mahnke, the woman and Father Meagher.*

" 'I'll be happy to have the woman tell her story to the chief,' the

priest said, 'but I won't be involved in a roundtable discussion with Mahnke. This is a serious matter and should be handled as such.'

*"Mahnke could not be reached for comment."* (Italics supplied.)

Plaintiff claimed that the italicized portions of the above article were false.

If all conflicts in the evidence are resolved in favor of plaintiff as the prevailing party below, the facts appear to be as follows: On January 15, 1960, Byron Blake, his sister, Mrs. June Spahr, and her 6-year-old daughter went to the Minneapolis Police Department. The daughter had told her mother that her father had been molesting her. The Reverend Thomas F. Meagher, who was executive director of the Catholic Welfare Association and who served also as Catholic chaplain for Hennepin County District Court and the Minneapolis municipal court, sent the mother and child to the police. Upon their arrival, Detective William T. Quady and a policewoman interviewed the mother and daughter, and the policewoman took statements from them. A physician had examined the daughter and had given a written report which apparently failed to support the claim of molesting.

Detective Quady had authority to have the father arrested. He had doubts at the time whether the available evidence would support a valid arrest, so he consulted with plaintiff at approximately 6:15 p. m. of that day, relating to plaintiff the information available. They then called an assistant county attorney, Ronald Meshbesher, to ask if he would authorize an arrest. Meshbesher said he would not do so under the circumstances and suggested that detectives be sent to the home to interview the father in order to develop either an admission or some further evidence which would support an arrest.

After this talk with Meshbesher, plaintiff and Detective Quady talked to Mrs. Spahr and her brother, Byron Blake. Both of them wanted the husband arrested. In accordance with the suggestion made by the assistant county attorney, plaintiff told Detective Quady that he should go out to the Spahr residence and question the father. At that point the brother asked if the police could absolutely guarantee that they would arrest Spahr if they went out to the house. Blake believed that Spahr had

been drinking and could be abusive to the family and he did not want Spahr contacted if he were not then arrested. Plaintiff explained to both Blake and Mrs. Spahr that such a guarantee could not be made. Mrs. Spahr and her brother then requested that detectives not be sent to the house to interview the father. When Mrs. Spahr indicated that her husband's driver's license had been suspended, a plan was devised to arrest him the next day when he would be driving his automobile, and Detective Quady prepared a directive to this effect. The plan was that after making an arrest for the driving offense the police would question Spahr with respect to the charge of molesting his daughter.

After these plans were made, plaintiff ascertained that Mrs. Spahr and her daughter could safely return to their home. The meeting between the parties, which had lasted about 1½ hours, then came to an end.

The record is clear that during the course of the meeting plaintiff did not refuse to arrest Spahr; Detective Quady did not seek permission from plaintiff to arrest Spahr; plaintiff did not fly into a rage or express any anger; he did not accuse the mother of trying to get even with her husband; he did not tell her there was no case; he did not refuse to send out detectives to make an arrest; and he did not express an opinion as to the guilt or innocence of the father, although in fact his personal opinion was that the man was guilty. Evidence was also presented showing that plaintiff was available to the writer of the newspaper article for comment.

The article was published January 21, 1960, some 6 days after the event reported.

The record indicates that plaintiff was not on duty January 16, the day following the meeting. However, at approximately 2:30 p. m. that day Detective Captain Calvin F. Hawkinson, then on duty, telephoned plaintiff and said that he had received a call from Father Meagher asking about the status of the Spahr matter. Plaintiff indicated surprise because of the plan that had been made the previous evening and asked if the man had not been arrested. Plaintiff then outlined to Captain Hawkinson the problems with the case as they had appeared the previous evening and said that Captain Hawkinson would have to use his judgment in the further handling of the matter.

It appears that Father Meagher informed Captain Hawkinson that he had talked to the doctor who had examined the child and that the doctor told him that the child's female organs were red and irritated—medical information that apparently did not appear on the report which the police had received the previous night. Captain Hawkinson also wanted some legal advice as to whether an arrest could be made. After obtaining the opinions of two assistant county attorneys, Bruce Stone and Chester Durda, that sufficient probable cause existed to arrest the father, he ordered Spahr's arrest. Arrested during the afternoon, Spahr subsequently admitted the offense with which he was then charged.

Max (Mickey) Schwartz, a reporter working at the rewrite desk for the St. Paul Dispatch January 21, 1960, wrote the article. As a rewrite man, Schwartz' job consisted of taking dictation from reporters who were out of the office and preparing stories that the city editor wanted "written in a hurry." His first knowledge of the incidents that had occurred 6 days before was obtained on the morning of January 21 in a call either to or from Minneapolis in which he was told there was a disagreement between Father Meagher and plaintiff. He did not assign the story to a reporter working outside the office, but instead handled it directly from the rewrite desk. He first attempted to reach Father Meagher and was successful only after what he described as "numerous phone calls." He reached Father Meagher at noon on January 21.

Schwartz did not recall whether he questioned Father Meagher carefully as to the events that occurred at the meeting about which the story was written. He said, however, that Father Meagher was, at the time of their conversation, irate. He did not recall whether he asked Father Meagher if he was present or personally witnessed the remarks and actions which his story attributed to plaintiff. He testified that he "assumed" Father Meagher was present.

The statement in the article that "the woman returned and told Father Meagher what happened" warranted the jury's implicit findings that Schwartz knew when he wrote the article that Father Meagher was not present at the meeting in question, and that Schwartz also knew that the information related to him in a secondhand fashion originally came from an upset person, the complaining mother. Schwartz did not call the mother

nor did he ask if Father Meagher had talked to Detective Quady or to the brother of the complaining woman. He made no attempt to reach either Detective Quady or the brother. He did, however, call Inspector Charles Weatherall who referred him to Chief of Police Milton Winslow. Winslow said that there had been a misunderstanding. Schwartz admitted that he disregarded that warning as not warranting further investigation of the facts and prepared the article as a routine story.

Schwartz testified that he tried unsuccessfully to reach plaintiff both at the police department and at home. In the article Schwartz stated that "Mahnke could not be reached for comment." Under the state of the record the jury could have found that this statement was false. Plaintiff testified that he was off duty, was at home during the entire period of time that Schwartz was preparing the article, and received no calls from Schwartz. Lucille Mahnke, plaintiff's wife, was also at home during this period of time. She testified he did not receive any calls that day. Schwartz claimed that he asked for plaintiff at police headquarters but that he did not attempt to do so until after he had talked to Inspector Weatherall, Chief Winslow, and Father Meagher. He said he did not leave a message for plaintiff because he was in too much of a rush and because any call he would have received from plaintiff would have been "too late to do me any good that day." It is apparent that the jury accepted plaintiff's testimony that he could have been reached for comment.

Schwartz first intended to print the article in the home edition, whether or not he reached plaintiff. When he had not succeeded in doing so by 12:30 p. m., the deadline for that edition, the city editor, who was Schwartz' immediate superior, had him hold the story for publication in the later edition so that he could reach plaintiff. Then at the suggestion of the city editor, Schwartz went to lunch, returning at 1 p. m. Upon his return from lunch Schwartz claimed he made a further attempt to reach plaintiff and then wrote the story in a "few minutes."

Plaintiff learned of the story, which is the subject of this action, on the evening that it appeared. He received a call from someone at the Dispatch, asking if he had read the story. The story was read over the telephone to him, and he was asked to comment. Plaintiff said the story

was completely untrue and that he would have no further comment until he read the article.

Subsequently, plaintiff demanded a retraction of the article. When a retraction was not forthcoming, he instituted this action. It first came before this court upon an appeal by plaintiff from a judgment of dismissal following the trial court's determination that his demand for a retraction did not comply with the requirements of Minn. St. 548.06.[1] We held that the demand did sufficiently comply with the statute and remanded the case for trial. Mahnke v. Northwest Publications, Inc. 266 Minn. 515, 124 N. W. (2d) 411.

■ Defendant contends that reversal of the $4,000 verdict against it is required because the article is within the fair-comment rule which under certain circumstances permits a defendant to escape payment of damages resulting from the publication of untrue statements about public officials or figures. This court has recently had occasion to consider the relevant authorities in Rose v. Koch, 278 Minn. 235, 154 N. W. (2d) 409.

Defendant assigns as error the lower court's denial of its motion for judgment notwithstanding the verdict or a new trial, citing the First and Fourteenth Amendments to the Federal Constitution and New York Times Co. v. Sullivan, 376 U. S. 254, 84 S. Ct. 710, 11 L. ed. (2d) 686, 95 A. L. R. (2d) 1412. Since defendant indicates that Minnesota now has a "new" law of defamation, it should perhaps be noted that in New York Times Co. v. Sullivan, *supra,* the United States Supreme Court adopted the position taken long before that case by this court and a minority of

---

[1] § 548.06 provides in part: "In an action for damages for the publication of a libel in a newspaper, the plaintiff shall recover no more than special damages, unless a retraction be demanded and refused as hereinafter provided. He shall serve upon the publisher at the principal place of publication, a notice, specifying the statements claimed to be libelous, and requesting that the same be withdrawn. If a retraction thereof be not published * * * he may allege such notice, demand, and failure to retract in his complaint and recover both special and general damages, if his cause of action be maintained. If such retraction be so published, he may still recover general damages, unless the defendant shall show that the libelous publication was made in good faith and under a mistake as to the facts."

other courts on the fair-comment privilege. Under this view, the privilege to publish defamatory statements about public officials without responding in damages extends to false statements made in good faith about a public official as well as to matters of comment only. One commentator analyzed the Supreme Court's action as follows:

"* * * The rule adopted by the Supreme Court in Sullivan is basically the same as the view espoused by a minority of the state courts * * *. In brief, the majority view has been eliminated by the position taken by the Supreme Court." Pierce, *The Anatomy of an Historic Decision: New York Times Co. v. Sullivan,* 43 N. C. L. Rev. 315, 342. See, also, Note, 18 Vanderbilt L. Rev. 1429, 1437; Note, 19 U. of Fla. L. Rev. 700.

Comment, 114 U. of Pa. L. Rev. 241, 242, lists Minnesota as one of the 10 states which had adopted the "Sullivan privilege," extending the fair-comment rule to false statements of fact, prior to that decision. The United States Supreme Court in the New York Times case also recognized Minnesota as a forerunner of its thinking on this point. The court in setting the standard to be applied henceforth by all states said (376 U. S. 279, 84 S. Ct. 726, 11 L. ed. [2d] 706, 95 A. L. R. [2d] 1435):

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. An oft-cited statement of a like rule, which has been adopted by a number of state courts, is found in the Kansas case of Coleman v. MacLennan, 78 Kan. 711, 98 P. 281."

Cited by the Supreme Court as an example of a "like rule" was the Minnesota case of Friedell v. Blakely Printing Co. 163 Minn. 226, 230, 203 N. W. 974, 975.

It has been said that New York Times Co. v. Sullivan is a most significant decision for the reasons that "not only did the Supreme Court enunciate, for the first time, a rule to govern 'the extent to which the consti-

tutional protections for speech and press limit a state's power to award damages in a libel action brought by a public official against critics of his official conduct,' but in making this decision the Court brought considerable uniformity to the law of libel and nullified an action which had encroached upon free speech and press 'under the guise of punishing for libel.' " Pierce, *supra*, p. 362.

Under the Supreme Court rule enunciated in the New York Times case, a person is culpable of actual malice if he makes a false statement against a public official "with reckless disregard" of whether it is false or not. It may be said that precisely what constitutes reckless disregard is an open question, since it must depend upon the facts and circumstances of each particular case. Undoubtedly, further litigation concerning the application of this standard may well be expected in the future. See, Pierce, *supra*, p. 343.

In its application of the law of defamation of public officials, the Minnesota Supreme Court has heretofore upheld a jury award based upon reckless libel. In MacInnis v. National Herald Printing Co. 140 Minn. 171, 167 N. W. 550, L. R. A. 1918D, 1091, plaintiff, an incumbent seeking reelection, sued for defamation when an article was published by the defendant charging that he was not a citizen. The article was published over the name of the rival candidate, who authorized its publication but did not compose the article. This court upheld an award including punitive damages against the defendant newspaper, stating (140 Minn. 175, 167 N. W. 551):

"* * * The court properly submitted the question of punitive damages. The jury could well enough conclude that the publication was attended with such recklessness as betokened an utter disregard of the plaintiff's rights and was actually malicious and called for punishment."

There was in the MacInnis case no charge of actual malice in the sense of ill will toward the plaintiff. Liability was sustained because of a reckless failure to find out the true facts before publication, the jury finding that recklessness existed to such an extreme degree as to support an award of punitive damages.

The United States Supreme Court has recently upheld an award based

on reckless defamation and in so doing has offered some relevant observations. In Curtis Pub. Co. v. Butts, 388 U. S. 130, 135, 87 S. Ct. 1975, 1981, 18 L. ed. (2d) 1094, 1099, the Supreme Court examined the current state of libel law as applied to public figures. At the outset of his opinion, Mr. Justice Harlan noted the need for—

"* * * some further exploration and clarification of the relationship between libel law and the freedom of speech and press, lest the New York Times rule become a talisman which gives the press constitutionally adequate protection only in a limited field, or, what would be equally unfortunate, one which goes far to immunize the press from having to make just reparation for the infliction of needless injury upon honor and reputation through false publication."

See, Time, Inc. v. Hill, 385 U. S. 374, 87 S. Ct. 534, 17 L. ed. (2d) 456.

■ In the words of Mr. Justice Black, concurring in the New York Times case, "malice" is "an elusive, abstract concept, hard to prove and hard to disprove." New York Times Co. v. Sullivan, 376 U. S. 293, 84 S. Ct. 733, 11 L. ed. (2d) 716, 95 A. L. R. (2d) 1444. Despite these conceptual difficulties, it is necessary to attempt to define the limits of "actual malice" as used in the New York Times case in order to determine if the facts in the case before us are sufficient to sustain the verdict. In New York Times, "actual malice" was defined to include a statement made "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U. S. 280, 84 S. Ct. 726, 11 L. ed. (2d) 706, 95 A. L. R. (2d) 1435. Unless a public official can establish that state of facts, he cannot recover for privileged libel.

In the case at bar, there has been no evidence and no claim that defendant knew the statements appearing in the article were false. Therefore, if plaintiff is to recover, he must establish that they were published with reckless disregard of whether what was written in the article was false. Plaintiff contends that the evidence here, in contrast to that in the New York Times case, is constitutionally sufficient to support a finding of such reckless disregard on defendant's part. In our opinion the record bears out this contention.

In its answer in this action defendant alleged that all matters in its story were true. The testimony set forth in the record clearly indicates that when the case came to trial it developed that defendant had little, if any, evidence which would indicate that any of the contested parts of the story were true; but there is sufficient evidence to sustain the jury's finding that the statements claimed by plaintiff to be false were in fact false. Plaintiff specifically denied that they were true. On direct examination Mr. Blake, who was called as a witness by defendant, testified that plaintiff did not fly into a rage and did not tell Mrs. Spahr there was no case. When asked if it were true that plaintiff refused to send detectives out to her home to make an arrest, Blake simply stated that he did not send them out to make an arrest. Blake also said that he did not hear plaintiff accuse Mrs. Spahr of trying to get even with her husband. Asked whether or not Detective Quady sought permission from plaintiff to arrest Mr. Spahr, Blake said, "He did consult with Captain Mahnke as to whether or not he should make the arrest, yes." Blake had also previously explained that Detective Quady, whom he characterized as most cooperative, was concerned about the legal problems in making the arrest and wished to speak to plaintiff concerning these problems. Detective Quady also testified that the challenged statements in the article were false. He confirmed plaintiff's testimony that the only reason an arrest was not made on January 15 was because they were uncertain as to whether there were sufficient grounds to make the arrest then and Mrs. Spahr and her brother were fearful that the husband might vent his rage on the family if he were released. Detective Quady said he did not seek plaintiff's permission to make an arrest, that plaintiff did not become angry, and that Quady did not hear plaintiff accuse Mrs. Spahr of trying to get even with her husband. Thus it is clear that the jury could find the article was in part false.

Defendant argues that the accuracy of the article, other than the portions italicized above, was not challenged, so plaintiff concedes the episode did occur and in the manner described in the article.

Plaintiff admitted that all italicized material except the last statement was attributed to Father Meagher, as can be plainly seen by any reader of the article. There is no claim that Father Meagher was misquoted, and

a Minneapolis reporter testified that he confirmed his exact quotes to her some hours after the article was published. However, it is clear from the record that whatever statements Father Meagher made had no foundation in fact and that, if a follow-up had been made by getting in touch with Detective Quady or plaintiff to verify the facts, it would have been made clear that Father Meagher was not present at the meeting on the afternoon of January 15, 1960; had no true knowledge of what had transpired on that occasion; and apparently no concern about clearing up a simple misunderstanding on the part of Mrs. Spahr and her brother about the caution taken by the officers in making the arrest. As the record stands, either Father Meagher had been misinformed or he recklessly made the statements quoted in the article without regard to whether they were true or false. In any event, it appears that the article was based only upon statements by someone who was not present at the meeting and was in no position to have the true facts in his possession.[2]

The article in question was of an unusual type involving serious libel implications, particularly because of the highly offensive nature of the charges which it contained. Since a period of 6 days had elapsed, it would seem that defendant could have taken the additional time necessary to learn what actually had happened. Instead, its reporter wrote an article stating that a person of Father Meagher's prominence had complained of plaintiff's treatment of Mrs. Spahr to the chief of police, the mayor of Minneapolis, and the Civil Service Commission, and had stated, "I don't care what Mahnke's punishment is, but he is going to get an official reprimand if I have to carry the matter to the governor."

The defamatory character of the article is plain. It contained the accusation that plaintiff refused to arrest an obvious child molester and, even worse, a man who had sexually molested his 6-year-old daughter. This was not all—the article went on to state that plaintiff "flew into a rage" when he learned that the complaining mother had discussed the case with her parish priest before coming to the police station. Not only was a picture painted of plaintiff as a policeman unconcerned with the apprehension of a man who had committed a serious and repulsive crim-

---

[2] Father Meagher predeceased the time of trial.

inal act, he was accused of harshly abusing a mother in time of great stress and with disrespect of her religion. The article further stated that plaintiff had accused the mother of trying to get even with her husband, had told her she had no case, and had refused to send a detective out to make an arrest. Certainly any person reading an account of such despicable conduct would react with resentment.

The article was placed on the front page of the newspaper, with a title sufficiently "catchy" so that it might cause persons merely glancing at the article to believe that plaintiff might have been involved in the molesting of a child. The location of the article demonstrates that it was given top importance, and Schwartz admitted that he knew the subject was serious. Defendant's executive editor admitted that readers of the story would be indignant and think that something should be done about it. Thus, it appears to us that the gravity of the charges in this story was a factor to be considered by the jury in assessing the conduct of defendant.

There were admissions on the part of defendant that it knew it was necessary to verify this kind of story before printing it. The city editor had refused to let the story go into the noon edition of the paper on January 21 because it lacked such verification from plaintiff. The reporter testified he was aware of the need to verify these statements:

"Q. Now, during the course of the conversation, did you conclude in your mind that this was a serious matter that was involved in this potential story?

"A. I thought so.

"Q. I assume then that because of that fact you were concerned about verifying the statements that would go into the story?

"A. True."

Yet the article was published without contacting anyone who was at the meeting at the police station and after verification only of the part of the story dealing with Father Meagher's reaction. Nothing had changed when the 2 o'clock deadline for the sunset edition arrived, but concern about verification apparently was forgotten. Plaintiff contends that the abandonment of such concern was a convincing admission of recklessness on the part of defendant.

He also points out that defendant had been put on notice of error in its story before it was published because Chief Winslow had warned Schwartz that there had been a misunderstanding as to what had actually occurred. The story itself reflects this fact, and that fact goes directly to the basic issue of the case. If one of the participants had been contacted, defendant would not have printed the article. Plaintiff contends that defendant's indifference to the police chief's warning alone would be sufficient proof of recklessness in publishing the article.

The evidence would warrant the jury in finding that little or no attempt was made to contact plaintiff before publication of the story and that plaintiff could have been reached at his home.

While Schwartz claimed that he knew Father Meagher and knew he had more experience in criminal matters because of his position as a chaplain than the average person does, plaintiff's knowledge of what occurred on the afternoon of January 15 was the key to the situation since Father Meagher did not attend the meeting and had no knowledge of what occurred except by hearsay coming from individuals who were troubled and upset, and who did not comprehend at the time the legal problems raised by their request that Spahr be arrested immediately. Had plaintiff or one of the other participants been contacted, it would appear that an accurate version of what happened would have eliminated the story for all practical purposes. Certainly the fact that a clergyman had been misinformed about the handling of a criminal complaint would not have been a sensational front-page story. The additional information and legal opinion which Captain Hawkinson had available to him the next day when the arrest was made would have altered the controversial nature of the story by placing plaintiff's official conduct in an altogether different light. A call to any of the detectives or police officials present at the hearing or concerned therewith could well have resulted in the story being shorn of any value as a news item at that late date. There is ample evidence upon which the jury could conclude that defendant was negligent in publishing the article, since Schwartz testified that he did not attempt to contact Detective Quady or Mrs. Spahr. There was also evidence that Schwartz was informed of the disagreement sometime during the morning of January 21, 1960, and that the article was written

by 2 p. m. that afternoon. There was evidence that plaintiff was available at home for comment if Schwartz had been more diligent in attempting to contact him. All these factors could lead the jury to believe that defendant was overly hasty and negligent in publishing an article containing an array of false statements.

Under the standards applied by the United States Supreme Court in the New York Times case for the protection of the freedom of the press under the First Amendment, neither proof that a statement is false nor that it was negligently written is sufficient to establish actionable libel against defendant. In order for plaintiff to recover, it is essential that he show "actual malice" on the part of defendant in the publication of the article by reckless disregard of whether the statements therein were false or not. We think the jury on the record presented here could find defendant's publication to have been made with such disregard. Several factors permit this conclusion. Under all the circumstances, the story was needlessly false. The statements relating to plaintiff could have been checked out by a reporter in a matter of hours and the false statements eliminated in a follow-up story in the next edition. The only purpose in publishing Father Meagher's version of a story 6 days old without verification from plaintiff or others present at the meeting—and in placing it on the front page—was to attract the interest of the reading public. The story was given the most controversial view possible, in the face of the warning that had been given by Chief Winslow that in fact the matter was based entirely upon a misunderstanding. The jury certainly could find that if defendant were concerned about the truth of this article it would, under the circumstances, have required additional supervision and checking before releasing the article for publication. Instead, routine treatment was given, the story being developed by a few telephone calls despite its unusual nature, and no reporter as assigned to check out the facts. Defendant's executive editor acknowledged that it would have been preferable to have a reporter talk to a person who was at the meeting. Schwartz admitted, however, that he would have published the story in the early edition without any verification but for the action of the city editor in holding it up. Under the circumstances the extent of the falsity contained in the article is also evidence of recklessness.

There is nothing in the evidence to indicate that Chief Winslow's explanation that there had been a misunderstanding was probed. Neither Captain Hawkinson, Detective Quady, nor plaintiff gave their version before the week-old occurrence was placed on the front page of the afternoon newspaper. The facts that the only news source contacted, Father Meagher, had not been present at the meeting, that he was then angry at plaintiff, and that the persons actually present at the meeting could have been and were not contacted, support the jury's finding of recklessness.

The trial court ruled that the failure to retract on the part of the defendant could not be considered by the jury. Plaintiff contends that the action of defendant on the demand for retraction is logically relevant to whether it was recklessly indifferent to the truth or falsity of the article and also that taking the failure to retract into account in determining reckless indifference to whether the story was true or false is the only way courts can encourage compliance by publishers with § 548.06.

Under the circumstances of this case, we think that the failure to retract the defamatory statements underscored defendant's reckless attitude as to the consequences of what had been published and that the jury was entitled to take that fact into consideration. See Pratt v. Pioneer-Press Co. 35 Minn. 251, 252, 28 N. W. 708, wherein Mr. Justice Mitchell, speaking for the court, said:

"If the question, generally, of the competency of this evidence was properly before us, no reason now occurs to us, if evidence of a retraction of a libel is competent in mitigation of damages, as showing a want of actual malice, why evidence of a refusal to retract, or of a peremptory and discourteous refusal to publish or even listen to a person's vindication of himself, is not competent as tending to show actual malice."

As we view it, the evidence considered by the United States Supreme Court in the Butts case has several parallels to the instant case. The court noted that the Butts story was in no sense "hot news." It appears that another person present when defendant's informant supposedly overheard the conversation of Butts upon which the defamatory story was based was not even interviewed. The Supreme Court felt that in the

light of the seriousness of the charges against Butts, the Post had ignored "elementary" precautions. The charge that a police officer "flew into a rage" upon learning of the fact that a complaining mother went to a priest before she went to the police and then refused to arrest the man who had molested her 6-year-old daughter, is no less serious. Certainly "elementary" precautions were ignored in the instant case as in the Butts case.

In sustaining the jury award in the Butts case, Mr. Justice Harlan, speaking for the court, pointed out (388 U. S. 147, 87 S. Ct. 1987, 18 L. ed. [2d] 1106):

" 'Newspapers, magazines, and broadcasting companies are businesses conducted for profit and often make very large ones. Like other enterprises that inflict damage in the course of performing a service highly useful to the public * * * they must pay the freight; and injured persons should not be relegated [to remedies which] make collection of their claims difficult or impossible unless strong policy considerations demand.' Buckley v. New York Post Corp. 373 F. 2d 175, 182."

Mr. Justice Harlan concluded by stating (388 U. S. 159, 87 S. Ct. 1994, 18 L. ed. [2d] 1114):

"* * * Publishers like Curtis engage in a wide variety of activities which may lead to tort suits where punitive damages are a possibility. To exempt a publisher, because of the nature of his calling, from an imposition generally exacted from other members of the community, would be to extend a protection not required by the constitutional guarantee. * * *

* * * * *

"Where a publisher's departure from standards of press responsibility is severe enough to strip from him the constitutional protection our decision acknowledges, we think it entirely proper for the State to act not only for the protection of the individual injured but to safeguard all those similarly situated against like abuse."

See Rosenblatt v. Baer, 383 U. S. 75, 92, 86 S. Ct. 669, 679, 15 L. ed. (2d) 597, 609, wherein the importance of reputation in our system of

ordered liberties and the protection of the law gives that right were expressed by Mr. Justice Stewart in his concurring opinion:

"* * * As the Court says, 'important social values * * * underlie the law of defamation. Society has a pervasive and strong interest in preventing and redressing attacks upon reputation.'

"The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system." [3]

---

[3] We quote in part from an article by Vermont Royster, editor of the Wall Street Journal, *The Free Press and a Fair Trial*, 43 N. C. L. Rev. 364:

"* * * [It is no accident] that in neither the first nor the fourth amendment did the drafters trouble to define freedom of the press, the form of a jury trial or the nature of the impartiality which the jurors are to possess.

"* * * As the Supreme Court observed nearly seventy years ago, 'The law is perfectly well settled that the first ten amendments to the Constitution, commonly known as the Bill of Rights, were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors * * *.'

"In the deep reaches of the common law those principles were not bred of abstract moral predilictions which, as Justice Holmes has said, 'must not be allowed to influence our minds in settling legal distinctions,' but rooted in harsh experience. Generations of experience had shown convincingly that without both of these guarantees—trial by jury and freedom of the press— no man was safe once caught in the sovereign's toils. The principles, then, were not philosophical but eminently practical.

"Yet so short are men's memories that we are now in a time when these two fundamental guarantees have come to be viewed by many people, including many supposedly versed in the law, as not only unrelated but even antagonistic and mutually irreconcilable.

 *    *    *    *    *

"Blackstone, that teacher of yesteryear who today is more honored than read, stated the matter clearly, and it is apparent that what he states is not a

An analysis of the current law of libel as applied to public officials may be found in Goldwater v. Ginzburg (S. D. N. Y.) 261 F. Supp. 784, in which the court denied defendant's motion for summary judgment on the grounds that evidence adduced upon the pretrial depositions was such that the jury might well infer "actual malice" within the meaning of the New York Times rule. For instance, the libelous charge of "nervous breakdown" on the part of the plaintiff in the Goldwater case came from one source only and the defendant did not know whether the source had personal knowledge of that fact. The source of the published libel in the case at bar was Father Meagher, who did not have personal knowledge of plaintiff's asserted misconduct.

---

one-sided doctrine but a two-pronged concept. He remarks in his *Commentaries:*

"The liberty of the press is indeed essential to the nature of the free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure from criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity.

\* \* \* \* \*

"But note especially that as Blackstone states the principle there is no freedom from accountability for what is written or said. If a man writes what injures another he has, in this view, committed a tort, as surely as if he had stabbed him with a pikestaff. If what a man writes is destructive to the ends of society, then society may afterwards bring him to task.

"Such was the concept of freedom of the press to those who drafted the first amendment; they felt no need to define their terms for their minds had been suckled on Blackstone. A man was as free to write as to walk down a public highway; but if in either case he trampled a neighbor or disturbed the peace he should answer for it.

"If today we have problems from 'freedom of the press' they derive not from holding to the first part of the doctrine but from softening the second part. We do still have libel laws but they are neither clear nor forceful; in the recent *New York Times* case the Supreme Court all but abolished them as they apply. to public officials. In most jurisdictions the concept of an answerable tort from the printed word has, for all practical purposes, been lost entirely."

In the Goldwater case Ginzburg testified, with respect to one of the published charges about Goldwater, that he did not consider whether it was true or false and all he cared about was printing what had been said. Clearly it can be said that the attitude of defendant's reporter was similar in the case at hand.

The untrue remarks published in the instant case about plaintiff were, in contrast to those allegedly made about Sullivan in the New York Times case, harmful as well as being *totally and completely untrue*. Defendant, prior to the publication of the article, relied on one irate person as a source of information, whereas defendant New York Times relied on many reliable people, obtained certification that the individuals had consented to the use of their names in the advertisement claimed to be libelous, and made the determination prior to publication that the advertisement did not contain attacks of a personal character. Moreover, there can be no question that the defamation in the instant case related to plaintiff.

Defendant argues that whatever doubt of its right to publish the article in question could have been left by the New York Times decision was foreclosed in defendant's favor by Washington Post Co. v. Keogh, 125 App. D. C. 32, 365 F. (2d) 965. As we see it, the Washington Post case is not applicable to the case at bar. That case involved a lawsuit against an individual newspaper stemming from the publication of a syndicated column written by a writer who for many years had written a daily column published in more than 600 newspapers with a daily circulation of 40 million. The case simply held that reckless disregard of the truth could not be premised on the failure of one of the 600 newspapers across the nation to send a reporter or investigator out to independently review the factual circumstances dealt with in each syndicated column that it published.

While defendant contends that the evidence did not establish reckless disregard on its part "with convincing clarity," [4] the evidence previously

---

[4] In a per curiam opinion filed November 6, 1967, Beckley Newspapers Corp. v. Hanks, 389 U. S. 81, 88 S. Ct. 197, 19 L. ed. (2d) 248, the United States Supreme Court, after "an independent examination of the record as a whole" (389 U. S. 82, 88 S. Ct. 198, 19 L. ed. [2d] 250), reversed a judg-

discussed contained several factors pointing strongly to such disregard and thus supports the jury's finding.

■■■ The trial court made every effort in submitting the issues to comply with the rule applied in the New York Times and Butts cases. It instructed the jury:

"* * * A printed publication is libelous if it tends to injure the reputation of another and adversely affect his good name and standing in his community or among his associates in his work. It is immaterial what meaning Defendant intended to convey by the printed language because the language must speak for itself in the light of all the circumstances. Under that statement or definition the article here in question is libelous. However, it does not necessarily follow therefrom that the Defendant must respond in damages for its publication and distribution.

"The Plaintiff was at the time of the printed article and still is a Captain of Detectives in the Police Department of the City of Minneapolis, and as such, he was at that time a public officer, and you are to consider him so during your deliberations. His conduct in the discharge of his official duties is a matter of public interest. Freedom of the press and of speech and discussion upon a subject in which the public has an interest, such as the conduct of a public officer in the discharge of his official duties, has a right guaranteed by the constitution of our country. The constitutional principle is based upon the principle of open debate and discussion on all public matters, and does not turn on the truth of the published statement or of the kind appearing in this case. The Defendant's newspaper has a constitutional right to publish the article in question here, and to quote therein statements attributed to Father Meagher. Even if

_____

ment for the plaintiff in a libel action by a public official against a newspaper upon the ground that the record failed to show that the defendant possessed the high degree of awareness of the probable falsity required by the rule enunciated in New York Times Co. v. Sullivan, 376 U. S. 254, 84 S. Ct. 710, 11 L. ed. (2d) 686, 95 A. L. R. (2d) 1412. We do not feel that the editorials in Beckley and the failure to make prepublication investigation there involved are comparable to the situation disclosed by the record in the case before us.

you find the article contains false or unverified statements as to truth or falsity, and even if you find the article is libelous as to the Plaintiff, nevertheless, the *Plaintiff may not recover damages from the Defendant unless he has proved by clear and convincing evidence that the publication of the article was actuated by actual malice that is with knowledge that it was false and was published with a reckless disregard of whether it was false or not. A reckless disregard means a conduct which is heedless and shows a wanton indifference to consequences. It is a conduct which is far more than negligent.*

"Even if you feel that the Defendant newspaper in failing to corroborate Father Meagher's statements with the Plaintiff himself or * * * was negligent in failing to corroborate those statements with other principals present at the meeting, these findings of negligence are insufficient in themselves to show negligence that is required for a finding on your part of actual malice.

"In order to recover in this action, the Plaintiff must prove by evidence that is clear and convincing that the Plaintiff has sustained certain injuries to his reputation by the reason of the publication of this article, and that the article was actuated by actual malice on the part of the Defendant, and that he was damaged thereby." (Italics supplied.)

Shortly after undertaking its deliberations, the jury returned for further instructions. The following discussion took place before the foreman of the jury and the trial court:

"Juror: We have a question, Your Honor. When you were reading your—the law to us, I believe that you made a statement that negligence on the part of the newspaper as far as not checking out the story further could not be used against them in the same sense that malice might be used. And I think that we have a question on that point, the difference between malice and negligence. Could you read that back to us?

"The Court: Well, the instruction as I read it was this: If you feel that the defendant newspaper was negligent in failing to corroborate Father Meagher's statement with the Plaintiff himself or was negligent in failing to corroborate those statements with other principals present at the meeting, these findings of negligence are insufficient in themselves

to show the recklessness that is required for the finding on your part of actual malice.

*    *    *    *    *

"I want to say that a reckless disregard means a conduct which is heedless and shows wanton indifference to consequences. Do you all understand what I mean? It is a conduct which amounts to negligence, and negligence I think you all may understand means the doing of something which a reasonable person would not do or the failure [to do] that a reasonable person would do under similar circumstances. That is negligence. But in this case, recklessness or reckless disregard means something over and above negligent conduct. Do you understand that?

"Juror: I think that answers our question. Thank you."

The court in a memorandum accompanying the order denying defendant's post-trial motion pointed out that the New York Times case lays down no guidelines as to what constitutes a "reckless disregard" except that mere negligence is insufficient, and said that what amounts to reckless disregard is clearly a jury question, citing Nusbaum v. Newark Morning Ledger Co. 86 N. J. Super. 132, 155, 206 A. (2d) 185, 198; Hogan v. New York Times Co. (2 Cir.) 313 F. (2d) 354; and MacInnis v. National Herald Printing Co. 140 Minn. 171, 167 N. W. 550, L. R. A. 1918D, 1091. We agree that this was a jury question. Moreover, we find the instructions given to the jury placed squarely before it the law set forth in the New York Times and Butts cases. It is the established rule in this state that a motion for judgment notwithstanding the verdict accepts the view of the evidence most favorable to the verdict and admits every reasonable inference to be drawn from such evidence, as well as the credibility of the testimony for the adverse party, and if the application of this rule, in the light of the evidence as a whole, discloses a reasonable basis for the verdict, the motion must be denied. 10 Dunnell, Dig. (3 ed.) § 5082, and case cited under note 18. Here, since there was evidence which would support a finding that defendant was guilty of reckless disregard of whether the article was false or not, and the verdict was arrived at under instructions correctly stating the applicable law, the trial court could not have properly granted defendant's motion.

The record indicates that defendant in support of its alternative motion for a new trial asserted 13 assignments of error. It does not appear that on this appeal any authorities have been submitted as to their merit. Under the circumstances, we are not bound to go into extended discussion of those assignments. However, the record establishes that the case was fairly and impartially tried and was submitted to the jury without prejudice to defendant.

Affirmed.

PETERSON, JUSTICE (dissenting).

The only issue in this case is whether the evidence constitutionally supports a jury verdict that defendant published a false and defamatory news story concerning plaintiff "with reckless disregard of whether it was false or not." No claim is made that the trial court's instructions under which the jury deliberated were constitutionally deficient, and no claim is made that the news story was published "with knowledge that it was false." [1]

The majority opinion, in concluding that the verdict is constitutionally sustainable, has considered the following elements: (1) That, although it is a fact that a prominent priest made a serious charge against plaintiff and although the priest was quoted with complete accuracy, the facts asserted by the priest were false, defamatory, and damaging to the professional reputation of plaintiff as a police official; (2) that, although the damage to plaintiff was the more serious because the charge emanated from a person of such acknowledged high repute in the community, the defendant newspaper acted with reckless disregard of truth when it relied upon the priest's factual statements; (3) that, because it was reason-

---

[1] The issue, then, is different than confronted us in Rose v. Koch, 278 Minn. 235, 154 N. W. (2d) 409. There we held that the *evidence* might have been sufficient to sustain a jury finding that a false and defamatory publication was made "with knowledge that it was false or with reckless disregard of whether it was false or not" but reversed a judgment for plaintiff because the trial court's *instructions* were constitutionally deficient. What we held in Rose v. Koch is applicable, however, to so much of the majority opinion in the instant case as would permit, for purposes of establishing constitutional malice, consideration of the fact that the publisher undertook to prove the truth of the alleged false statements and its refusal to publish a retraction.

ably apparent to defendant that the priest had no independent and first-hand knowledge of all the facts upon which he based his charge and because defendant acknowledged it would have been preferable to have made a prepublication inquiry of plaintiff or other principals involved in the underlying events, its unverified publication of the priest's statements was an extreme departure from accepted standards of investigation and reporting; (4) that, although asserting that it had undertaken to reach plaintiff for comment prior to the deadline for publication of its "Sunset Edition," defendant had not in fact done so; (5) that, instead of admitting the factual errors contained in the priest's charge, defendant undertook at trial to prove that the facts were true; and (6) that, although plaintiff had demanded that defendant publish a retraction of the news story, defendant had refused to do so.

The decision in the instant case calls into consideration two of the several United States Supreme Court decisions on the new law of libel: New York Times Co. v. Sullivan, 376 U. S. 254, 84 S. Ct. 710, 11 L. ed. (2d) 686, 95 A. L. R. (2d) 1412, and Curtis Pub. Co. v. Butts, 388 U. S. 130, 87 S. Ct. 1975, 18 L. ed. (2d) 1094. The majority opinion places great reliance on the Butts decision both on the ground that the facts in that case and this are "parallel" and on the ground that it provides the constitutional definition of "reckless disregard" of truth. I disagree. It is necessary, therefore, to consider those cases in some depth before undertaking to measure the constitutional sufficiency of the evidence in the instant case.

■ New York Times Co. v. Sullivan, *supra,* like the instant case but unlike the Butts case, involved defamation of a public official. Plaintiff was one of three elected commissioners of the city of Montgomery, Alabama, with principal authority over the city's police department. The "Committee to Defend Martin Luther King and the Struggle for Freedom in the South" sponsored a full-page advertisement in the New York Times, which was tendered through an advertising agency.[2] A. Philip Ran-

---

[2] The fact that the defamatory statements were contained in a newspaper advertisement, the court held (376 U. S. 266, 84 S. Ct. 718, 11 L. ed. [2d] 698, 95 A. L. R. [2d] 1427), did not distinguish it from a regular newspaper article: "It communicated information, expressed opinion, recited griev-

dolph, a labor leader of national stature, was chairman of the committee and a number of citizens of high repute were members of it, including prominent clergymen of Catholic, Jewish, and Protestant faith. The thrust of the advertisement soliciting funds for the defense of the late Dr. King was that "thousands of Southern Negro students are engaged in wide-spread non-violent demonstration in positive affirmation of the right to live in human dignity as guaranteed by the U. S. Constitution and the Bill of Rights," but that "[i]n their efforts to uphold these guarantees, they are being met by an unprecedented wave of terror by those who would deny and negate that document which the whole world looks upon as setting the pattern for modern freedom." Implication of any person in a wave of terror, and to such end, would rightly evoke feelings of revulsion against such person. Succeeding paragraphs purported to illustrate the "wave of terror" by describing certain alleged events including the following paragraphs, which referred, as the jury found, to plaintiff:

"In Montgomery, Alabama, after students sang 'My Country, 'Tis of Thee' on the State Capitol steps, their leaders were expelled from school, and truckloads of police armed with shotguns and tear-gas ringed the Alabama State College Campus. When the entire student body protested to state authorities by refusing to re-register, their dining hall was padlocked in an attempt to starve them into submission.

*    *    *    *    *

"Again and again the Southern violators have answered Dr. [Martin Luther] King's peaceful protests with intimidation and violence. They have bombed his home almost killing his wife and child. They have assaulted his person. They have arrested him seven times—for 'speeding,'

---

ances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern. * * * That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold * * *. Any other conclusion would discourage newspapers from carrying 'editorial advertisements' of this type, and so might shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities—who wish to exercise their freedom of speech even though they are not members of the press."

'loitering' and similar 'offenses.' And now they have charged him with 'perjury'—a *felony* under which they could imprison him for *ten years.*"

The defamatory statements were false in that, although substantial numbers of armed police were at the Alabama campus, they did not "ring" the campus and they did not "padlock" the dining hall to starve the students into submission. If the advertisement were read to charge that plaintiff had committed or condoned bombing, assaults, or baseless arrests as to Dr. King and his family, that too was untrue. The point is it could be found there, as the jury found here, that the advertisement's charges were based upon false and defamatory statements of fact.

The New York Times had established "advertising acceptability standards," for the purpose of rejecting advertisements that were "fraudulent or deceptive" or that contained "attacks of a personal character." Yet, relying on their knowledge of the good reputation of those who had sponsored the advertisement and deeming it unobjectionable under acceptability standards, the Times made no other investigation. Although it apparently had several contemporaneous news stories in its files relating to certain of the events and occurrences referred to in the advertisement, it did not check its own files.[3] 376 U. S. 261, 84 S. Ct. 716, 11 L. ed. (2d) 695, 95 A. L. R. (2d) 1425. The United States Supreme Court held that this evidence "supports at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice." 376 U. S. 288, 84 S. Ct. 730, 11 L. ed. (2d) 711, 95 A. L. R. (2d) 1439.

The Times did not admit the untruth of the advertisement at trial but, instead, the corporate secretary of the company asserted that, except for the statement concerning "padlocking," the statements in the advertisement were "substantially correct." The Alabama Supreme Court in New York Times Co. v. Sullivan, 273 Ala. 656, 144 So. (2d) 25, 51, concluded that this was a "cavalier ignoring of the falsity of the advertisement [from which] the jury could not have but been impressed with the bad faith of The Times, and its maliciousness inferable there-

---

[3] It is apparent, too, that the Times did not check with any of the 60 persons whose names appeared on the advertisement as sponsors, nor, so far as it appears, did it solicit comment from any official of Montgomery.

from." The United States Supreme Court concluded, on the contrary, that such assertion "does not indicate malice at the time of the publication" and further, that "there was no evidence to impeach the [Times'] good faith in holding it." 376 U. S. 286, 84 S. Ct. 729, 11 L. ed. (2d) 710, 95 A. L. R. (2d) 1438.

Plaintiff Sullivan, like plaintiff in the instant case, demanded that the New York Times publish a retraction of the advertisement. So, also, did the governor of Alabama. The demands, as appears in the briefs of the parties, quoted the foregoing paragraphs of the advertisement and asserted that those "and the publication as a whole charge me with grave misconduct and of [sic] improper actions and omissions as an official." Although the Times published the retraction as demanded by the governor,[4] it did not do so for Sullivan. It instead wrote him a letter, stating in part:

"We have been investigating the matter and are somewhat puzzled as to how you think the statements in any way reflect on you. So far, our investigation would seem to indicate that the statements are substantially correct with the sole exception that we find no justification for the statement that the dining hall in the State College was 'padlocked in an attempt to starve them into submission.'

\*     \*     \*     \*     \*

---

[4] As disclosed in the briefs of the parties in New York Times, the retraction reported the governor's protest, quoted his letter and the specific language of the advertisement of which he complained, and followed with a "Statement by the New York Times," stating in part: "The publication of an advertisement does not constitute a factual news report by The Times nor does it reflect the judgment or the opinion of the editors of The Times. Since publication of the advertisement, The Times made an investigation and consistent with its policy of retracting and correcting any errors or misstatements which may appear in its columns, herewith retracts the two paragraphs complained of by the Governor." The Times justified the granting of a retraction to him and not to plaintiff Sullivan on the ground it felt that, since the governor apparently believed he had been libeled by said advertisement, it should apologize. The Times did not think that "any of the language in there referred to Mr. Sullivan." 376 U. S. 262, 84 S. Ct. 716, 11 L. ed. (2d) 696, 95 A. L. R. (2d) 1425. Neither, of course, did it think it referred to the governor.

"In the meanwhile you might, if you desire, let us know in what respect you claim that the statements in the advertisement reflect on you."

The United States Supreme Court said as to this (376 U. S. 286, 84 S. Ct. 729, 11 L. ed. [2d] 729, 95 A. L. R. [2d] 1438):

"* * * The Times' failure to retract upon respondent's demand, although it later retracted upon the demand of Governor Patterson, is likewise not adequate evidence of malice for constitutional purposes. *Whether or not a failure to retract may ever constitute such evidence,* there are two reasons why it does not here. *First,* the letter written by the Times reflected a reasonable doubt on its part as to whether the advertisement could reasonably be taken to refer to respondent at all. *Second,* it was not a final refusal, since it asked for an explanation on this point—a request that respondent chose to ignore. Nor does the retraction upon the demand of the Governor supply the necessary proof. It may be doubted that a failure to retract which is not itself evidence of malice can retroactively become such by virtue of a retraction subsequently made to another party." (Italics supplied.)

The judgment for plaintiff was reversed both on the ground that the trial court's instruction was constitutionally deficient *and* on the ground that the evidence was constitutionally insufficient (376 U. S. 264, 84 S. Ct. 717, 11 L. ed. [2d] 697, 95 A. L. R. [2d] 1426):

"* * * We hold that the rule of law applied by the Alabama courts is constitutionally deficient for failure to provide the safeguards for freedom of speech and of the press that are required by the First and Fourteenth Amendments in a libel action brought by a public official against critics of his official conduct. We further hold that under the proper safeguards the evidence presented in this case is constitutionally insufficient to support the judgment for respondent."

The now-familiar New York Times rule upon which judgment was reversed is (376 U. S. 279, 84 S. Ct. 726, 11 L. ed. [2d] 706, 95 A. L. R. [2d] 1435):

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory false-

hood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." [5]

■  Curtis Pub. Co. v. Butts, *supra,* must be considered in two separate aspects to determine whether it is of persuasive application to the instant case: (a) Whether it is factually parallel to the instant case or at least more nearly parallel than in New York Times; and (b) whether in affirming judgment for Butts, the decision afforded definition to the "reckless disregard" of truth element in the rule of New York Times. I think, on this analysis, it does not support the decision in the instant case.

First, as to the facts, the Saturday Evening Post, one of defendant's magazines, published a false and defamatory article concerning Wallace Butts, the athletic director and a former head football coach of the University of Georgia. He was, as such, a "public figure." He was not, however, a "public official" for he was employed by the Georgia Athletic Association, a private organization and not a state agency. The Post published an "exposé" concerning his "fixing" a forthcoming football game between the University of Georgia and its rival, the University of Alabama. It was, unlike either the instant case or New York Times, completely false. Its damaging and defamatory character was beyond doubt; its only purpose was consistent with a deliberate policy of "so-

---

[5] Our own decision in Friedell v. Blakely Printing Co. 163 Minn. 226, 203 N. W. 974, adds no weight to decision in this case for the same reasons we noted in Rose v. Koch, 278 Minn. 235, 154 N. W. (2d) 409. New York Times noted it by footnote as constituting a "like rule." That reference originated in a footnote citation in the briefs of New York Times and the American Civil Liberties Union to identify those courts that "have shown solicitude for the freedom to criticize the conduct of officials by requiring that the aggrieved official prove the critic's malice, abrogating the presumptions and strict liability that otherwise obtain." Similar to the New York Times rule, moreover, it does make reference to acting "causelessly and wantonly to the injury of the plaintiff," or making a publication notwithstanding the fact that "knowledge of the falsity is brought home to the person making it." 163 Minn. 230, 203 N. W. 975. To the extent, however, that it undertakes to define wanton conduct differently than in the New York Times line of cases, it has no continued authority.

phisticated muckraking" to promote circulation and advertising revenue; and the Post itself concluded that "careers will be ruined, that is sure." The Post relied for its story upon the questionable affidavit of a stranger who, known to be on probation in connection with bad check charges, was not known for probable reliability—a distinction from New York Times and this case too obvious to belabor. Nevertheless, and to that extent like New York Times and the instant case, the Post made no attempt to pursue numerous avenues of verification available to it. Because the story was a magazine article, moreover, it was not "hot news" having a daily deadline, so there was more time available for investigation—a distinguishing fact emphasized by the court itself in its companion case, Associated Press v. Walker, 388 U. S. 130, 87 S. Ct. 1975, 18 L. ed. (2d) 1094. Worse still, and to me plainly distinguishable from a post-publication refusal to retract, the Post published its article, without verification, in the face of a prepublication notice from Butts himself that the forthcoming article was absolutely untrue.

Second, the decision was nevertheless that of a divided court. The main opinion, written by Mr. Justice Harlan for only four members of the court, espoused a new rule (388 U. S. 155, 87 S. Ct. 1991, 18 L. ed. [2d] 1111):

"* * * [A] 'public figure' who is not a public official may * * * recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers. * * *

"Nothing in this opinion [however] is meant to affect the holdings in New York Times and its progeny, including our recent decision in Time, Inc. v. Hill."

It is most important to note two things, however: (a) The rule espoused by the four justices did not purport to apply to public *officials,* as distinguished from public *figures* who are not public officials, and (b) it did not, in any event, purport to define "reckless disregard" of truth. This

was made crystal clear in the concurring opinion of Mr. Chief Justice Warren (388 U. S. 163, 87 S. Ct. 1995, 18 L. ed. [2d] 1115):

"* * * MR. JUSTICE HARLAN's opinion departs from the standard of New York Times and substitutes in cases involving 'public figures' a standard that is based on 'highly unreasonable conduct' and is phrased in terms of 'extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers' * * *. * * *

"To me, differentiation between 'public figures' and 'public officials' and adoption of separate standards of proof for each has no basis in law, logic, or First Amendment policy."

Only Mr. Chief Justice Warren, it appears, would have held that both the instructions and the evidence measured up to the standards of New York Times. It is true that Mr. Justice Brennan, joined by Mr. Justice White in dissent, acknowledged that the *evidence* might be constitutionally sufficient to sustain the judgment, dissenting only on the ground that the *instruction* was constitutionally deficient. It is equally true that the four justices subscribing the main opinion intended to increase the exposure of the press to liability for defamation, but, even so, that intent was manifested only as to public figures.[6] We concluded in Rose v. Koch, 278 Minn. 235, 262, 154 N. W. (2d) 409, 428, that:

---

[6] Time, Inc. v. Hill, 385 U. S. 374, 87 S. Ct. 534, 17 L. ed. (2d) 456, involving an invasion of privacy of a public "personality" in a magazine article, lends some additional insight. Mr. Justice Harlan had there concurred in part with the majority opinion, but dissented to the "sweeping extension of the principles of New York Times v. Sullivan," stating that the majority opinion, written by Mr. Justice Brennan, "would seem to grant a 'talismanic immunity' to all unintentional errors." 385 U. S. 405, 407, 87 S. Ct. 551, 552, 17 L. ed. (2d) 477. Mr. Justice Fortas, joined by Mr. Justice Clark and Mr. Chief Justice Warren, dissented, stating (385 U. S. 411, 87 S. Ct. 554, 17 L. ed. [2d] 480): "Perhaps the purpose of the decision here is to indicate that this Court will place insuperable obstacles in the way of recovery by persons who are injured by reckless and heedless assaults provided they are in print, and even though they are totally divorced from fact." He added, significantly only in a dissenting opinion: "An error in the course of investigation might be mere negligent misstatement. Failure to make a reasonable investigation is something else. The standard of a 'reasonable investigation' is certainly a

"* * * It would seem, therefore, that the justices advocating that standard, as well as the justices who announced adherence to New York Times for both public figures and public officials, would agree that malice is not less than such 'highly unreasonable' conduct." [7]

A more recent decision of the United States Supreme Court, Beckley Newspapers Corp. v. Hanks, 389 U. S. 81, 88 S. Ct. 197, 19 L. ed. (2d) 248, sheds additional light on the application of the two prior decisions. There plaintiff, a public official, recovered damages upon a jury verdict for defendant's editorial comment which among other things asserted that plaintiff had threatened and intimidated another public official, a woman, in the course of a public controversy over fluoridation of the local water supply. The threats and intimidation were denied by both plaintiff and the woman public official. Defendant admitted at trial that it had made no "special investigation" before publishing the article's but, instead, "[felt] there was that possibility." The court reversed, holding (389 U. S. 84, 88 S. Ct. 200, 19 L. ed. [2d] 252)—

"* * * it cannot be said on this record that any failure of petitioner to make a prior investigation constituted proof sufficient to present a jury question whether the statements were published with reckless disregard of whether they were false or not. Cf. New York Times v. Sullivan, *supra,* at 287–288 [84 S. Ct. 730, 11 L. ed. (2d) 710–711, 95 A. L. R. (2d) 1439]; Time, Inc. v. Hill, 385 U. S. 374, 388–389 [87 S. Ct. 534, 542–543, 17 L. ed. (2d) 456, 467] (1967). See also Curtis Publishing Co. v. Butts, *supra,* at 153–154 [87 S. Ct. 1990, 18 L. ed. (2d) 1110] (opinion of MR. JUSTICE HARLAN)."

The most recent decision of the United States Supreme Court, decided since the initial writing of the instant opinions, explicates the meaning of "reckless disregard" yet more narrowly. St. Amant v. Thompson,

---

minimum yardstick by which to measure the liability of publishers." 385 U. S. 417, 87 S. Ct. 557, 17 L. ed. (2d) 484.

[7] In Garrison v. Louisiana, 379 U. S. 64, 74, 85 S. Ct. 209, 216, 13 L. ed. (2d) 125, 133, which did involve a public official, the New York Times rule was refined to mean a "high degree of awareness of * * * probable falsity."

390 U. S. 727, 88 S. Ct. 1323, 20 L. ed. (2d) 262, reiterated the rule that "[f]ailure to investigate does not in itself establish bad faith" and added the touchstone of "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." 390 U. S. 731, 733, 88 S. Ct. 1325, 1326, 20 L. ed. (2d) 267, 268. Because, as Mr. Justice White wrote for the majority, there can be no "one infallible definition" and "its outer limits will be marked out through case-by-case adjudication," we must again consider the factual analogue. 390 U. S. 730, 88 S. Ct. 1325, 20 L. ed. (2d) 267.

Thompson, defamed by St. Amant, was a deputy sheriff in East Baton Rouge Parish, Louisiana. St. Amant, a candidate for public office, made a televised speech in which, quoting one Albin, a dissident member of a local Teamsters Union, he in substance falsely charged Thompson with gross misconduct in the performance of his public duties in connection with the allegedly nefarious activities of one Partin, the local union president. The Louisiana Supreme Court concluded that St. Amant had acted in reckless disregard of the truth, based upon certain considerations summarized in the opinion of Mr. Justice White (390 U. S. 730, 88 S. Ct. 1325, 20 L. ed. [2d] 266):

"* * * St. Amant had no personal knowledge of Thompson's activities; he relied solely on Albin's affidavit although the record was silent as to Albin's reputation for veracity; he failed to verify the information with those in the union office who might have known the facts; he gave no consideration to whether or not the statements defamed Thompson and went ahead heedless of the consequences; and he mistakenly believed he had no responsibility for the broadcast because he was merely quoting Albin's words."

Mr. Justice White observed that, of those stated considerations, "the failure of Thompson's evidence to demonstrate a low community assessment of Albin's trustworthiness" was "[c]loser to the mark" for properly testing "reckless disregard." He noted that this evidence in the record indicated that Albin was sufficiently reliable to refute the claim that St. Amant had recklessly relied upon the information from Albin: St. Amant had known Albin for about 8 months; he had verified "other aspects"

of Albin's information and "had affidavits from others"; Albin "seemed to St. Amant" to incur personal danger by such public disclosure of dispute within the union; "[a]ccording to Albin, he was prepared to substantiate his charges"; and Albin had first sworn to his answers in writing and later "in the presence of newsmen." 390 U. S. 733, 88 S. Ct. 1326, 20 L. ed. (2d) 268. The decision of the Louisiana Supreme Court affirming the libel judgment against St. Amant was, on this evidence, reversed and remanded.[8]

■ We turn, then, to the constitutional sufficiency of the evidence supporting the jury's verdict in the instant case. The St. Paul Dispatch, defendant's evening newspaper, contained a story concerning a priest's charge against plaintiff, a police officer, on January 21, 1960. Defendant published a follow-up story in the St. Paul Pioneer Press, its morning newspaper, on January 22, 1960. Plaintiff's claim of libel is based only upon the story in the Dispatch, not that in the Pioneer Press. Captain Mahnke was, while on duty, in charge of the Detective Bureau of the Minneapolis Police Department, outranked only by the inspector of detectives, the inspector of police, and the chief of police. He was, without question, a public official, so that the test of defendant's constitutional privilege is to be judged under the rule of New York Times.[9]

The news story published by defendant, as the jury could find upon disputed evidence, was in part false and defamatory. The first paragraph

---

[8] Only Mr. Justice Fortas dissented, reiterating the views he had expressed in Time, Inc. v. Hill (footnote 6, *supra*), and concluding that "[t]he principle of Curtis Publishing Co. v. Butts * * * should lead us to affirmance here." 390 U. S. 734, 88 S. Ct. 1327, 20 L. ed. (2d) 269. Mr. Justice Black and Mr. Justice Douglas concurred for the reasons stated in their concurring opinions in New York Times Co. v. Sullivan, 376 U. S. 254, 84 S. Ct. 710, 11 L. ed. (2d) 686, 95 A. L. R. (2d) 1412, and Garrison v. Louisiana, footnote 7, *supra.*

[9] The trial court properly instructed the jury on this point: "The Plaintiff was at the time of the printed article and still is a Captain of Detectives in the Police Department of the City of Minneapolis, and as such, he was at that time a public officer, and you are to consider him so during your deliberations. His conduct in the discharge of his official duties is a matter of public interest." Accord, Pape v. Time, Inc. (7 Cir.) 354 F. (2d) 558.

of a news story, as I understand it, customarily contains the essence of a news story, and in this case it read:

"A *Minneapolis Catholic* priest today demanded an official reprimand for one of that city's detective captains because he said the police official had refused to arrest a man involved in a serious child-molesting case."

Even under the rule viewing the facts most favorably to support a jury verdict, I have difficulty in concluding that this statement was either false or defamatory. It seems clear to me from the evidence that plaintiff (for perfectly proper reasons) had at the outset declined to make an outright arrest as demanded by the complainant. The only basis upon which he was prepared to make an arrest was either after an interrogation of the suspect father at his home or on the basis of arranging the next day to arrest him for an entirely different charge of driving after revocation of license. The word "decline" might be more felicitous than the word "refuse," but they are synonymous.

The second paragraph identified plaintiff by name and official capacity as the person subject to the priest's charge, together with the priest's accurately quoted statement that he would carry his complaint "to the governor if necessary." There is nothing either false or defamatory about this paragraph, although identification, direct or indirect, is an essential element of a defamation action.[10]

---

[10] The headline to the Dispatch story had read:
"Cop Rebuke in Tot
Molesting Urged"
The majority opinion states that this caption was "sufficiently 'catchy' so that it might cause persons merely glancing at the article to believe that plaintiff might have been involved in the molesting of a child." I have no difficulty in agreeing that the headline was not only "catchy" but clumsy. Newspaper headlines often bear little similarity to the content of the article and may, if it contains identification, have a devastating effect in the eye of the casual reader. Here, however, the headline could not have had such effect until one had read at least the first two paragraphs of the article itself, from which it would be clear that defendant was not implying that plaintiff was a child molester. The caption to the follow-up story was more appropriately worded:
"*Cites Arrest Refusal* —
Reprimand Cop
Priest Demands"

The third paragraph indicated how the priest, Father Thomas F. Meagher, had come by his knowledge of the child-molesting offense. The fourth paragraph quoted Father Meagher's characterization of the *offense of the father* as "the worst case of incest ever to come to my attention." It was not itself false or defamatory to plaintiff as a recital of the situation out of which it arose; it did give "sting" to the story, but was contextually not distinguishable from the situation in New York Times.

The fifth paragraph identified Father Meagher's own capacity as a chaplain for the Hennepin County District Court and the Minneapolis municipal court and recited that statements had been taken from the complainants. This part of the paragraph was neither false nor defamatory. The paragraph contained the additional statement that "Detective William Quady then sought permission from Captain Mahnke to arrest the father," which the jury apparently found to be false and conceivably defamatory. I have some difficulty, notwithstanding the jury's verdict, in considering it defamatory.

It is the sixth and seventh paragraphs which could most reasonably be considered defamatory:

"Rev. Meagher said Mahnke 'flew into a rage' when he learned the woman had discussed the case with her parish priest before coming to police and accused her of 'trying to get even with her husband.'

" 'Mahnke told her there was no case and refused to send out detectives to make the arrest,' Father Meagher said today. 'I don't believe police officials should be allowed to set themselves up as judges and juries in the face of such evidence.' "

Of these two statements, the description of plaintiff acting in an unprofessional manner, raging at the complainant and impugning her motives, seems to me to be the more defamatory. It has a close parallel to the situation in New York Times, where a police official was charged with the unprofessional and shocking conduct of padlocking the university dining hall to starve dissenting students into submission, heedless of the rising voice of the Negro in the South. It is much less similar, in my opinion, to the defamatory statement in Curtis Pub. Co. v. Butts, *supra*, that an athletic director had set out to betray his own football team by fixing the game.

The eighth paragraph stated that Father Meagher had subsequently complained to Captain Calvin Hawkinson (who was subsequently on duty in charge of the detective bureau); that Hawkinson had had the man arrested; that the father had admitted the molestation; and that the father was being held in jail pending the filing of charges. The ninth paragraph factually recited that Father Meagher had carried the complaint to the chief of police, the mayor, and the city's civil service commission. The tenth paragraph reiterated Father Meagher's intent that Mahnke "is going to get an official reprimand if I have to carry the matter to the governor." No claim was made that any of these statements were either false or defamatory.

The eleventh and twelfth paragraphs recited that the chief of police had commented to the priest that the affair was only a "misunderstanding or error of judgment" and that the priest had refused to participate in a meeting scheduled by the chief with plaintiff and the complainant. No claim is made that any of these statements were false or defamatory. The paragraphs were, if anything, favorable to plaintiff and gave notice to the reader that Father Meagher may have misunderstood the situation. I would agree that a sophisticated reader might treat the quoted language of "misunderstanding" as time-honored officialese—not having the purpose of denying the statements but merely of calming irate citizens or protecting errant officials. But, unlike the majority, I cannot credit it at face value as a "warning" to the defendant that it must check out the factual allegations before publishing the news story. It is in no sense a prepublication denial of truth in the sense of the Butts case.

The final paragraph stated:

"Mahnke could not be reached for comment."

The jury found, upon disputed evidence, that this was false—that Mahnke was indeed available for comment and that the writer had not in fact attempted to contact him. The fact that it is false, however, does not make it defamatory.[11]

---

[11] Although I would not read it as defamatory, I suppose it might be true that there are readers who might in some cases draw the conclusion that an official under fire had secluded himself to avoid the necessity of reply. It

Measured by the New York Times rule and its application there and in such later cases as Beckley Newspapers Corp. v. Hanks, *supra*, and St. Amant v. Thompson, *supra*, I would hold as a matter of law that the reliance of defendant upon the report from Father Meagher was not so unreasonable as to constitute reckless disregard of whether the priest's report was true or false. The writer of the news story may have been imperceptive to the fact that Father Meagher was not an eyewitness to the event upon which he based his charge and to that extent might be said to be negligent. The situation, however, has no parallel to the reckless reliance of the Saturday Evening Post in writing a ruinous article on the basis of an affidavit from an unreliable person who purported to report a conversation to which he was not privy but had allegedly and accidentally overheard, the setting in the Butts case.

Measured by the rule and its application in New York Times, defendant's failure of investigation was not more serious than in New York Times. The article concerning the priest's charge was "hot news" as much as in Associated Press v. Walker, *supra*, and there was a deadline to meet. The events which caused Father Meagher to make his charge were several days old, but the charge itself was made the same day that defendant published it.

Defendant's executive editor admitted at trial that it would have been "preferable" to have contacted the other persons involved in the story before publishing it, thereby in a sense admitting that such action would represent a reasonable standard of investigation and reporting. Although the New York Times might well have withheld inserting an advertisement until it could check its own files or query its own correspondents in

might well be fairer for a publisher to indicate, less cryptically, that the account states only one side of the issue, that an effort will be made to contact other persons involved, if not yet available, and that their views will be stated in a follow-up story. Defendant's follow-up story did make a report of its subsequent contact with plaintiff as follows: "Capt. Mahnke said Thursday night he had discussed the matter fully with Chief Winslow and had been told a meeting was being arranged with the persons involved.

" 'I wouldn't want to make any comment until after we have had a chance to meet with them,' he said, adding that all of the allegations made against him by Father Meagher would be answered at that time."

Alabama (as it subsequently did when confronted with a demand for retraction), in accordance with its standards of advertising acceptability, it was held that its failure evinced no more than ordinary negligence, not a reckless disregard of truth. Here, defendant withheld the story until the final deadline for its Sunset Edition. Even assuming that "reckless disregard" of truth were the equivalent of "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers," the rule espoused in Butts in relation to defamation of public figures (388 U. S. 155, 87 S. Ct. 1991, 18 L. ed. [2d] 1111), I cannot agree that defendant's negligence was that great. Defendant's conduct has no parallel to the conduct of Saturday Evening Post in that case.

One aspect of the majority's opinion in this case gives me additional pause. It is suggested that, had any of the detectives or police officials present at the hearing or concerned with the reported events been interrogated, it could "well have resulted in the story being shorn of any value as a news item." This is a journalistic judgment, not a judicial one. Had those officials been contacted, their version of the events would have been made public. This would not necessarily have excluded the same report of Father Meagher's version. It is not the constitutional responsibility of the newspaper, in my opinion, to weigh the competing versions, make its own determination of ultimate fact, and then vouch for the facts it thus reports. If it were, there would cease to be a "debate on public issues" or the "unfettered interchange of ideas" which, as stated in New York Times, is the very thing the First Amendment was intended to protect.

The majority opinion finds support for the jury verdict in the fact that defendant undertook to prove the truth of Father Meagher's statements rather than admit their untruth. This, of course, is not the teaching of New York Times. It is contrary even to our own recent decision in Rose v. Koch, where we held (278 Minn. 264, 154 N. W. [2d] 428):

"The unsuccessful attempt to prove the truth of the defamatory statement cannot itself, in our opinion, establish actual malice."

The last, and most difficult, aspect in this case is the failure of de-

fendant to retract. Plaintiff, through his attorneys, wrote defendant on January 28, 1960, stating in part:

"We hereby give notice that your article printed on the first page of your January 21, 1960, issue of the St. Paul Dispatch included false, scandalous, defamatory, and libelous charges against our client, Captain Mahnke. All charges published therein concerning the conduct, advice, or actions of Mr. Mahnke are noted as matters in this complaint. A photostatic copy of this article is enclosed herewith as 'Exhibit A.'

"It is hereby demanded that you retract in the future the false, scandalous, defamatory, and libelous charges made against Mr. Mahnke in this article."

Thereafter, on February 4, 1960, defendant, by its attorneys, replied, in a manner somewhat analogous to the newspaper's response in New York Times, stating in part:

"* * * We are unable at this time to determine what portion or portions of the article should be retracted. We feel, and have advised the newspaper that no action can be taken on your demand until and unless you specify the slanderous material in the article."

We held in Mahnke v. Northwest Publications, Inc. 266 Minn. 515, 124 N. W. (2d) 411, that plaintiff's notice of retraction sufficiently specified the particular part of the published article containing false and defamatory matter and held it a sufficient compliance with the statute. New York Times considered a similar demand for retraction and held under the circumstances of that case that the failure to retract would not support a finding of malice. The situations are by no means completely analogous, of course, because in New York Times the newspaper had "a reasonable doubt * * * as to whether the advertisement could reasonably be taken to refer to plaintiff at all." 376 U. S. 286, 84 S. Ct. 729, 11 L. ed. (2d) 710, 95 A. L. R. (2d) 1439.

We said in Rose v. Koch, 278 Minn. 263, 154 N. W. (2d) 428:

"Whether a failure to make a retraction of a libelous statement is evidence of malice is as yet uncertain. Although the making of a demand for retraction is prerequisite for an award of punitive damages against

a newspaper under Minnesota statute, this state law is not determinative. New York Times expressly reserved the question of '[w]hether or not a failure to retract may ever constitute such evidence.' * * * It would otherwise have been our opinion, as it was that of the trial court, that such circumstances would be of real relevance on the issue."

The question is admittedly still an open one, for our comment in Rose was our dictum based upon a prefatory statement of Mr. Justice Brennan that might be deemed dictum. It seems to me now that, *if* the evidence rather clearly establishes that the action of the publisher *at the time of publication* was no more than ordinary negligence, the postpublication action of the publisher in refusing to retract cannot logically relate back to change the quality of the original act. It may evince no more than the publisher's honest belief that the defamatory statements were true, which we have held he may rightfully undertake to prove at trial. I can conceive of situations, however, where the publisher's conduct at the time of publication may strongly suggest an intent to injure through calculated falsehood or reckless disregard of truth, to which the postpublication conduct may relevantly relate back and give "convincing clarity." I do not believe that this is such a case, and I believe that whether or not the jury considered the fact that defendant had refused to retract, the case falls short of establishing constitutional malice with the convincing clarity required by the rule of New York Times.[12]

---

[12] Some question exists in my mind concerning the extent to which the jury may have based its verdict upon the fact of defendant's refusal to retract. Plaintiff's second amended complaint did contain allegations that he had mailed a written notice and demand for retraction to defendant, a copy of which was attached to the complaint, and that a retraction was not published in a regular issue of the newspaper within one week thereafter; and plaintiff demanded exemplary damages because "defendant's conduct was willfully and maliciously undertaken with a reckless and wanton disregard of the rights of plaintiff." But when plaintiff offered a copy of its written demand for retraction into evidence, defendant objected on the ground that "so far as the issues in this case are concerned it is immaterial and irrelevant." *The court sustained the objection.* Immediately thereafter the following, as the *only* other evidence on this subject, occurred:

I would therefore reverse and direct the entry of judgment for defendant notwithstanding the verdict.

OTIS, JUSTICE (dissenting).
I join in the dissent of Mr. Justice Peterson.

---

"Q. [By plaintiff's counsel]: Was there a retraction published in the Defendant's newspaper?

"A. [Plaintiff]: No, sir, there was not.

"Q. And did you at some point determine to commence the present action?

"A. Yes, a few weeks later I did make that decision.

* * * * *

"Q. Now, to clarify this, when you say that you heard nothing, you are referring to the fact that there was no retraction printed in the paper?

"A. That is correct, yes, sir."

Plaintiff's position, as disclosed in chambers, presents an interesting contrast both to the "retraction" in New York Times and to his own position on defendant's failure to contact him for comment. The rewrite reporter who had authored the article offered to testify: "I told [plaintiff] that if he cared to make any comment on the events that had taken place or if he had any objections to any of the portion of the statements which Father Meagher had made in the article that we had carried the previous evening, or the past Thursday, that I would be very happy to print them with the same amount of space, the same kind of a display that had been given to Father Meagher's article, and his answer to that was that he had turned the matter over to his attorney, that any further comment would have to come from him." This was offered neither as proof of an offer of retraction nor for the purpose of minimizing exemplary damages, but only on "the question of rebutting evidence of malice" and showing good faith. Plaintiff had declined to so comment, however, on the ground that to do so would have the effect of repeating the original charge of Father Meagher and thereby give further currency to it. The evidence was excluded.